J.H., Appellant,

v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, Appellee.

No. S–09471.

Supreme Court of Alaska.

Aug. 31, 2001.

---

Frank J. Bettine, Anchorage, for Appellant.

Lisa B. Nelson, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

James H. Parker, Assistant Public Advocate, and Brant McGee, Public Advocate, Anchorage, for Guardian ad Litem.

Before FABE, Chief Justice, MATTHEWS, EASTAUGH, BRYNER, and CARPENETI, Justices.

## OPINION

BRYNER, Justice.

## I. INTRODUCTION

Jane Hart's parental rights to her three-year-old daughter, Jenny, were terminated by the superior court.[1] This case presents

---

1. To protect anonymity, we use pseudonyms for J.H. and other family members throughout this opinion.

the questions whether the Department of Health and Social Services (the department) was estopped from petitioning for termination of Jane's parental rights and whether the trial court's factual findings supporting termination are clearly erroneous. Because the court's findings are not clearly erroneous and the evidence does not warrant estoppel and because applying estoppel against the state would in any event violate the public interests served by the termination statute, AS 47.10.088(d), we affirm the superior court's decision.

## II. *FACTS AND PROCEEDINGS*

Jane Hart's daughter Jenny was born prematurely and tested positive for cocaine on July 26, 1996. Jane did not know who Jenny's father was.[2] The department thus immediately took emergency custody of Jenny and placed her in a foster home, where she has continued to live throughout this litigation.

By the time Jenny was born, Jane had a long history of abusing drugs, becoming involved with abusive men, and neglecting her children. She had begun drinking alcohol at age fourteen and had become addicted to cocaine by age eighteen. Jane had repeatedly participated in drug treatment and returned to using. Three of the four sons Jane bore before giving birth to Jenny were born cocaine-exposed and Jane was not parenting any of her children when Jenny was born. Jane's two oldest sons were raised by their paternal grandmother who became their guardian. Jane's two youngest sons were adopted by other people. Two of the three fathers of Jane's sons were physically abusive to her.

The department petitioned to adjudicate Jenny as a child in need of aid. Jane stipulated that the department's petition was supported by probable cause and that Jenny could remain in the department's temporary custody pending resolution of the petition. The department immediately began providing supportive services to Jane and arranged an appointment for Jane at a drug treatment facility. Jane nevertheless persisted in her pattern of substance abuse. In August 1996, the month following Jenny's birth, Jane was arrested for felony possession of cocaine. She eventually pleaded no contest to misconduct involving a controlled substance, was sentenced to jail, and remained in a correctional setting until the summer of 1997. While in state custody, Jane received substance abuse treatment and anger management classes; the department also arranged for her to begin periodic visitation with Jenny.

While Jane was in custody she stipulated that Jenny was a child in need of aid. Upon Jane's release from custody, the department adopted a case plan that called for her to be reunited with Jenny by Jenny's second birthday, in July 1998. Jane was required to continue with substance abuse treatment and comply with several other conditions during that time. The case plan expressly provided that if she failed to comply and could not be safely reunited with Jenny by July 1998, the department would cease its reunification efforts and seek permanent placement in an adoptive home.

Soon after Jane's release from state custody—by September 1997—the department implemented the plan by referring Jane to several support services for continued substance abuse treatment, acquisition of parenting skills, and working through issues related to past victimization and sexual abuse. In October 1997 the superior court issued a disposition order formally approving the department's case plan and directing Jane to comply with its requirements.

By November 1997 Jane was pregnant by her boyfriend, Don Denver, whom she had met when they were both inmates at Glenwood Correctional Center. Denver had a criminal record and abused alcohol. In November 1997 Denver told the department that Jane used crack cocaine. Jane admitted to her probation officer that she had used cocaine. The probation officer gave Jane the choice of returning to jail or entering a resi-

---

**2.** Jane listed Walter Roe as the father at birth, but subsequent paternity testing refuted his paternity.

dential substance abuse program. Jane opted for rehabilitation and entered the Dena A. Coy residential treatment center for pregnant women in December 1997.

Because of Jane's relapse, the department reevaluated her case plan and considered petitioning for termination of her parental rights to Jenny. Jenny's guardian ad litem had previously advocated termination of Jane's parental rights and was agreeable to the department doing so. But the department opted not to seek immediate termination, and Jane remained in treatment at the Dena A. Coy center, received visitation with Jenny there, and continued to receive various therapeutic services that the department arranged to facilitate eventual reunification.

In April 1998, while Jane was still in residential treatment at Dena A. Coy, she gave birth to her daughter, Carrie. Within about two months, Jane completed the residential phase of the program and moved into her own residence with assistance arranged by the department. She worked with Catholic Social Services Beyond Shelter to enter subsidized housing, established her own household, and kept physical custody of Carrie. Beyond Shelter assisted Jane in finding employment and arranged day care so that Jane could work. Jane continued in aftercare with the Dena A. Coy program, attended Alcoholics Anonymous meetings, had weekly counseling with a therapist, and received home-based instruction in parenting and time and stress management through Anchorage Center for Families. Jane continued her relationship with Carrie's father, Don Denver.

In June 1998, shortly before Jane's annual review hearing, the department convened a meeting to review her case plan. The department adopted a new case plan, which listed concurrent goals for Jenny. The plan called for Jenny's reunification with Jane by December 1998; it assumed that Jane would continue to make progress toward reunification and would complete the Dena A. Coy aftercare substance abuse program by December as scheduled. Alternatively, the new concurrent plan provided for adoption by Jenny's foster mother if reunification did not succeed. Jane refused to sign the new case plan.

In keeping with the new case plan's listing of termination as a concurrent goal, the social worker assigned to Jane's case, Nancy Mattson, filed a termination worksheet with the attorney general, indicating the department's intent to terminate; but the department took no formal action toward termination at that time. Jane continued to have home visits with Jenny and to receive supportive services aimed at preparing her for Jenny's return.

At the annual review in July 1998, the superior court formally approved the department's concurrent case plan and set December 31, 1998, as the tentative date for Jenny's reunification with Jane. Jane's counsel requested that she be allowed additional visitation with Jenny. In light of the newly established target date for reunification and Jane's request for increased visitation, the department arranged for the Anchorage Center for Families to perform an evaluation of Jenny's relationship with Jane and of the effects that reunification might have on Jane and Jenny.

In late August or early September 1998, Phil Kaufman replaced Mattson as the social worker assigned to Jane's case. Kaufman allowed Jane increased visitation with Jenny but told Jane that he had reservations about the plan to return Jenny to Jane in December and doubted that reunification could occur before March 1999. Kaufman stated that he believed that Jane would need to maintain sobriety on her own for at least three months after she completed aftercare at Dena A. Coy.

These events roughly coincided with the effective date of a newly adopted version of Alaska's child in need of aid statutes, which required the department—subject to certain exceptions that we will discuss later—to petition for termination of parental rights in all pending child in need of aid cases involving children who had spent fifteen of the most recent twenty-two months in foster care. Jenny had spent more than twenty-two months in continuous foster care. In September 1998 Kaufman prepared a new case plan listing adoption as the department's sole goal for Jenny.

Shortly after Kaufman wrote the new case plan, Lori Varick, a doctoral candidate in clinical psychology and counselor with the Anchorage Center for Families, submitted a written report assessing Jane's capacity to attach with Jenny and form maternal bonds. Varick noted Jane's progress in therapy and reported that Jane appeared to have the ability to bond with her daughter; but she also mentioned that Jane's history pointed to a high risk of relapsing.[3]

Unhappy with the prospect of delaying Jane's reunification until March 1999 and with Kaufman's newly written case plan, Jane's attorney filed a superior court motion requesting a formal placement review hearing.

The superior court standing master held the review hearing in October 1998. The department relied on a variety of factors to argue that it would be appropriate to proceed toward termination of Jane's parental rights because Jane would not be able to provide safe care for Jenny in a time frame that would be in Jenny's best interest. Kaufman believed that caring for both Carrie and Jenny would be too much responsibility for Jane and would increase the likelihood of Jane relapsing. He noted Jane was already at high risk of relapsing and suggested that Jane would need to remain sober for some time after completing the Dena A. Coy aftercare to demonstrate her recovery. Varick's report seemed to confirm that belief and the strong possibility of relapse. The department also relied on the new statute that seemed to require prompt commencement of termination proceedings. The guardian ad litem supported the department's plan to seek termination of Jane's parental rights. Jane's counsel argued against the new plan and urged the master to retain the original goal of reunification by December 1998.

Upon completion of the review hearing, the standing master accepted the department's position and issued an order that approved the new plan and directed the department to file a petition for termination of Jane's parental rights by November 1, 1998. Jane's counsel evidently did not seek further review of the master's decision by a superior court judge; nor did Jane petition for review by this court.

The department filed its petition to terminate Jane's parental rights to Jenny on December 4, 1998. The termination trial began four months later, in April 1999, and continued sporadically, with several lengthy breaks, through the summer and into the fall.[4] Throughout the course of these proceedings Jane received support services to assist her with reunification and she was allowed to maintain her established schedule of visitation with Jenny. But as the termination trial progressed, Jane's progress toward a clean and sober lifestyle began to unravel; by the time the trial ended, the department had taken emergency action to remove Carrie from Jane's home, and it was apparent that Jane had suffered a relapse.

At the close of termination proceedings, the superior court made findings about Jane's long-standing history of substance abuse, her established pattern of progress in drug treatment followed by periods of relapse, and her repeated association with violent men who participated in drug-related criminal activity. The court found that Jane would remain at high risk for relapsing, that she failed to recognize how her conduct affected her children, and that, given the passage of time since her birth, Jenny would likely experience severe emotional trauma if she were removed from her foster home and was unable to form a stable lifestyle and secure bonds with Jane.

---

3. Although the department had evidently contemplated that the Anchorage Center for Families's report would assess Jane's actual relationship with Jenny and Jenny's relationship with her foster parents, a mixup in communications evidently caused Varick to misunderstand the department's intent. As a result, Varick's report focused exclusively on Jane's capacity for attachment. It did not purport to consider the relationship between Jane and Jenny or Jenny's

relationship with her foster family; nor did it purport to evaluate Jenny's best interests.

4. The state had also petitioned to terminate the rights of Jenny's father, whose identity remained unknown; his paternal rights were terminated in April 1999, shortly before Jane's termination trial began.

The court went on to find by clear and convincing evidence that Jenny was a child in need of aid on grounds including that Jane had subjected other children to neglect and that her ability to parent had been substantially impaired by her drug abuse. The court also found that Jane had not remedied the conduct that caused Jenny to be a child in need of aid within a reasonable time. Finally, the court found that the department had made reasonable but unsuccessful efforts to facilitate reunification and that Jenny's best interests required termination of Jane's parental rights.

Jane appeals.

## III. DISCUSSION

Jane disputes the superior court's factual findings, arguing that the evidence fails to support the court's findings. Jane also contends that the department was estopped from petitioning for termination of her parental rights.

### A. Standard of Review

■ We review the superior court's factual findings for clear error and will set them aside only if a review of the entire record

---

5. See R.J.M. v. State, Dep't of Health & Soc. Servs., 973 P.2d 79, 84 (Alaska 1999).

6. See A.B. v. State, Dep't of Health & Soc. Servs., 7 P.3d 946, 950 (Alaska 2000).

7. Additional findings required under the federal Indian Child Welfare Act for Indian children do not apply to this case and are not considered in this opinion.

8. See AS 47.10.088(a)(1)(B):
   (a) Except as provided in AS 47.10.080(o), the rights and responsibilities of the parent regarding the child may be terminated for purposes of freeing a child for adoption or other permanent placement if the court finds
   (1) by clear and convincing evidence that
   (A) the child has been subjected to conduct or conditions described in AS 47.10.011; and
   (B) the parent
   (i) has not remedied the conduct or conditions in the home that place the child at substantial risk of harm; or
   (ii) has failed, within a reasonable time, to remedy the conduct or conditions in the home that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury[.]

---

leaves us firmly convinced that a mistake has been made.[5] We use our independent judgment to determine whether the department was estopped from petitioning for termination of Jane's parental rights and whether the superior court's factual findings satisfy statutory requirements.[6]

### B. Jane's Parental Rights Were Properly Terminated.

#### 1. The superior court's factual findings

■ Alaska law requires courts to make several express findings before terminating the rights of a parent whose child is a child in need of aid.[7] The court must find by clear and convincing evidence that the child is a child in need of aid and that the parent has either failed to remedy the conduct that gave rise to the original risk causing the child to need aid or has unreasonably failed to take remedial action in time to prevent future risk from occurring by returning the child to the parent's custody;[8] it must find by a preponderance of the evidence that the state made reasonable efforts to prevent out-of-home placement and to enable the safe return of the child to the parent's home;[9] and it must

---

9. AS 47.10.088(a)(2) requires the court to find "by preponderance of the evidence that the department has complied with the provisions of AS 47.10.086 concerning reasonable efforts."
   AS 47.10.086 provides, in relevant part:
   (a) Except as provided in (b) and (c) of this section, the department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement. The department's duty to make reasonable efforts under this subsection includes the duty to
   (1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;
   (2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian to community-based family support services whenever community-based services are available and desired by the parent or guardian; and
   (3) document the department's actions that are taken under (1) and (2) of this subsection.

also find that the child's best interests require the parent's rights to be terminated.[10]

Here, the superior court made the requisite findings, but Jane contends that the evidence fails to support them. Jane does not contest the finding that Jenny was a child in need of aid, but she insists that the superior court erred in finding that the department made reasonable efforts to reunite the family, that she had failed to remedy the conduct that placed Jenny in need of aid, and that termination would serve Jenny's best interests.

### a. Reasonable efforts to reunite the family

■ Jane first challenges the court's finding that the department made reasonable efforts to provide her with support services that would enable her. to be reunited with Jenny.[11] But the record includes abundant support for the superior court's reasonable efforts finding. The department provided family support services to Jane throughout Jenny's life and continued to provide supportive services after the date set forth in the court's original disposition order, after the department petitioned for termination, and throughout the lengthy course of Jane's termination trial. That support included

various substance abuse rehabilitation programs, psychological therapy, assistance re-establishing a household, and home-based instruction in parenting and time and stress management.

The department's extensive and protracted efforts could be found reasonable under any conceivable standard.

### b. Unreasonable delay in remedying the conduct that placed Jenny at risk

■ The record similarly supports the superior court's finding that Jane failed to remedy the conduct that placed Jenny in need of aid within a reasonable time to prevent a substantial risk of serious emotional harm to Jenny if she were returned to Jane's custody.[12]

By the time Jane's trial concluded, more than three years had passed since Jenny's birth. Although Jane had struggled to conquer her longstanding substance abuse problem during this time, sometimes showing considerable progress, the evidence at trial suggested that her efforts remained unsuccessful to a significant degree. Witnesses addressing Jane's most recent conduct testified that she had resumed drinking; had

---

**10.** *See* AS 47.10.088(b) and (c):

(b) In making a determination under (a)(1)(B) of this section, the court may consider any fact relating to the best interests of the child, including
(1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
(2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
(3) the harm caused to the child;
(4) the likelihood that the harmful conduct will continue; and
(5) the history of conduct by or conditions created by the parent.
(c) In a proceeding under this chapter involving termination of the parental right of a parent, the court shall consider the best interests of the child.

**11.** We note that, in advancing this argument, Jane claims that the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101 et seq., applies to CINA cases. Alleging that she is a disabled person under the ADA and that the act' therefore required the department to accommodate her disability, Jane broadly asserts that the superior

court improperly excluded evidence that would have enabled her to prove that the department failed to comply with the ADA's requirements. But the record belies her claim of improperly excluded evidence: our review of the record reveals that the superior court excluded no evidence Jane offered in support of her ADA theory and did not restrict her argument on the point. Although Jane's ADA theory shifted somewhat in the course of the trial, she ultimately contended that she was disabled by virtue of her drug addiction and that the ADA therefore entitled her to additional time to prepare herself for parenting Jenny. Although Jane's claim that she qualifies as a disabled person by virtue of drug addiction is questionable under ADA regulations, *see* 28 C.F.R. § 35.131, we accept it for present purposes, and we also assume arguendo that the ADA governs CINA proceedings. In context, however, AS 47.10.086(a)'s requirement that the department make reasonable efforts to provide Jane with family support services appears to be essentially identical to the ADA's reasonable accommodation requirement. Accordingly, we need not independently address Jane's ADA theory in disposing of her appeal.

**12.** *See* AS 47.10.088(a)(1)(B)(ii) (quoted *supra* note 8).

twice left her youngest daughter, Carrie, in the care of others without prior arrangement while she went out drinking; was no longer going to work as scheduled; and had resumed her relationship with Carrie's father, Don Denver, who had a history of domestic violence and substance abuse.

Moreover, expert witnesses qualified to testify about recovery from long-term substance abuse and relapse risk confirmed that activities like these are typical behavior for a person relapsing toward substance abuse.[13] And the record leaves little doubt that a relapse by Jane would have placed Jenny at risk had she been returned to her mother's home.[14] The superior court was not clearly erroneous in concluding that Jane had failed to remedy her problem within a reasonable period of time.

### c. Best interests

■ The same evidence of emotional risk to Jenny from an unstable relationship, combined with the evidence indicating that Jane was relapsing and remained at high risk of returning to substance abuse, also supported the superior court's finding that termination of Jane's parental rights would be in Jenny's best interests. The court was not clearly erroneous in finding that Jenny needed permanence and stability and could not afford to wait any longer for Jane to be ready to provide a maternal relationship.

In summary, then, the superior court's findings supporting termination of Jane's parental rights were not clearly erroneous.

**13.** On appeal, Jane attacks the qualifications and credibility of expert witness Lori Varick. But when Varick was called to testify at trial, Jane's counsel did not object to Varick's qualification as an expert; indeed, he informed the court that he would have called Varick to testify if the state had not. Jane has thus failed to preserve this argument for appeal. *See Collins v. State,* 977 P.2d 741, 745 (Alaska App.1999).

**14.** Laura Jones, a clinical psychologist with expertise in attachment and bonding, testified that a toddler removed from the home where she had lived all her life could suffer serious emotional problems if moved to the custody of a person with whom she had no stable attachment.

**15.** The revised version of AS 47.10.088 states in critical part:

### 2. Estoppel

■ Jane independently asserts that, even if the superior court's findings are supported by substantial evidence, the department should be equitably estopped from terminating her parental rights. In support of this argument, Jane points to the department's sudden shift of position toward termination in September 1998. Jane notes that, two months before, in July 1998, the department had committed to and the court had approved a concurrent plan promising to reunify her with Jenny by December if she continued to make satisfactory progress. Insisting that she did continue to make satisfactory progress through December and beyond, Jane complains that the department has shown no adequate justification for deciding in September to switch the goal to termination.

In response, the department proposes that its changed position was reasonable given the totality of the circumstances: the passage of time from Jenny's birth to September 1998, the growing uncertainty about whether Jane would be ready to assume full motherhood duties by December, and the obvious need to avoid an even longer delay. In the department's view, the changed plan was particularly appropriate because the amended version of AS 47.10.088, which took effect on September 14, 1998, required the department to petition for termination immediately in cases that, like Jane's, involved a child who had been in foster care for more than fifteen of the most recent twenty-two months.[15]

(d) Except as provided in (e) of this section, the department shall petition for termination of a parent's rights to a child, without making further reasonable efforts, when a child is under the jurisdiction of the court under AS 47.10.010 and 47.10.011, and

(1) the child has been in foster care for at least 15 of the most recent 22 months;

. . . .

(e) If one or more of the conditions listed in (d) of this section are present, the department shall petition for termination of the parental rights to a child unless the department

. . . .

(2) is required to make reasonable efforts under AS 47.10.086 and the department has not provided to the parent, consistent with the time period in the department's case plan, the family support services that the department

The department acknowledges that the provision allows exceptions, but claims that Jenny's case was not exceptional.

█ Jane replies that the amended statute allowed an exception in her case and therefore cannot justify the department's sudden shift in position. We agree with Jane's argument that the amended statute would have allowed an exception in her case.[16] And for purposes of this decision we assume that there may be merit to her broader argument that Kaufman acted arbitrarily and unfairly by unilaterally revising the June 1998 concurrent case plan to provide for termination as the plan's only goal. But even so, other factors lead us to reject Jane's ultimate contention that the doctrine of equitable estoppel barred the state from terminating her parental rights.

Equitable estoppel typically comprises four elements: "(1) assertion of a position by conduct or word, (2) reasonable reliance thereon, ... (3) resulting prejudice" and, when estoppel is claimed against the state, (4) a lack of significant prejudice to the public interest.[17] Jane's claim relies on strong evidence that the department's June 1998 case plan squarely adopted the position that Jenny could be returned to Jane in December 1998 if Jane remained in compliance with the conditions of the plan; the evidence of Jane's reliance on this position is equally strong— Jane did comply with the case plan through December 1998.

█ Yet Jane's claim of resulting prejudice is considerably weaker: she has arguably failed to demonstrate how her reliance on the department's original position ultimately prejudiced her ability to gain custody of Jenny.[18] The fourth element of estoppel poses an even greater obstacle to Jane's claim, for important public interests would surely be impaired if the department's improvident actions could compromise the best interests of children who were genuinely at risk from parental abuse and neglect. Just as a custodial parent cannot waive child support that is due from the noncustodial parent,[19] neither can the department, by working toward reunifying families, waive a child's interest in terminating contact with parents when clear and compelling evidence demonstrates that restoring custody would place the child in ongoing jeopardy of serious physical and emotional harm.

█ Moreover, even if we assume that the doctrine of equitable estoppel might be applied in certain exceptional termination cases, it certainly could not apply in the specific circumstances presented here. Jane's claim of estoppel is based on allegedly arbitrary actions of her social worker in unilaterally altering her case plan without adequate justification. Yet Alaska's CINA statutes provide procedural safeguards specifically designed to protect a parent from

has determined are necessary for the safe return of the child to the home.

16. Although the condition listed in AS 47.10.088(d)(1) applied in this case because Jenny had been in foster care continuously for more than 15 months before the statute took effect on September 14, 1998, the exception stated in paragraph (e)(2) also fit the case precisely: the department was required to make reasonable efforts in Jane's case; the most recent approved version of her case plan—the June 1998 concurrent plan—determined that additional family support services would be necessary until December 1998; and the department had not yet provided all those services to Jane.

17. *Municipality of Anchorage v. Schneider,* 685 P.2d 94, 97 (Alaska 1984).

18. In her briefing, Jane claims that she relied on the state's conduct and oral as well as written word and worked diligently on her case plan, investing her time and emotions so she could be reunified with [Jenny]. The Department's actions resulted in extreme prejudice to [Jane] as the Department's change of position has deprived [Jane] of her right to companionship and society with her daughter. But Jane does not explain how working with services aimed at reunification was detrimental to her efforts to regain custody of her daughter.

19. *See Keating v. Traynor,* 833 P.2d 695, 696 (Alaska 1992) ("[A] parent may not waive the requirements of Rule 90.3 by private agreement.") (citing *Bergstrom v. Lindback,* 779 P.2d 1235, 1237–38 (Alaska 1989)); *see also State, Dep't of Revenue v. Valdez,* 941 P.2d 144, 154 n. 14 (Alaska 1977) ("Where CSED is acting on behalf of the custodial parent to collect child support which is then passed through to that parent, CSED's conduct cannot amount to waiver or estoppel. The right to support is that of the child and thus cannot be waived by CSED.").

suffering prejudice as a result of such arbitrary state action. Under AS 47.10.080 a parent aggrieved by a placement decision is entitled to request court review of the department's action.[20] Here, Jane, represented by capable counsel, availed herself of this procedural right. Upon conducting a hearing to review the department's action, the superior court master expressly ratified the prior decision to initiate termination proceedings. The department took no irreversible action toward termination until the court had approved its decision.[21] And even when it acted, the department did not cease its ongoing reunification efforts.

 We conclude, given these circumstances, that the superior court master's approval of the department's decision would cut off any claim of estoppel arguably arising from arbitrariness inherent in the department's abrupt decision to change Jane's plan. The ensuing termination action ultimately resulted not from the hasty and impulsive action of an individual departmental case worker, but from a considered decision of the superior court.[22]

One last point deserves emphasis in connection with Jane's estoppel claim: the strong evidence, described above, of the last-minute relapse that occurred in the course of Jane's trial figured prominently in the superior court's ultimate termination decision. Jane makes no claim that the behavior involved in her relapse had any causal connection to the department's earlier improvident handling of her case. Hence, the new evidence of Jane's continuing impairment would independently preclude any claim that the department's earlier actions—no matter how arbitrary they might have been—estopped it from pursuing its action to terminate Jane's parental rights.

For all these reasons, we conclude that equitable estoppel does not bar the judgment terminating Jane's parental rights.

## IV. CONCLUSION

The superior court's decision is AFFIRMED.

**20.** AS 47.10.080(f) provides:

A child found to be a child in need of aid is a ward of the state while committed to the department or the department has the power to supervise the child's actions. For an order made under (c)(1) of this section, the court shall hold a permanency hearing as required by (l) of this section and at least annually thereafter during the continuation of foster care to determine if continued placement, as it is being provided, is in the best interest of the child. The department, the child, and the child's parents, guardian, and guardian ad litem are entitled, when good cause is shown, to a permanency hearing on application. If the application is granted, the court shall afford these persons and their counsel reasonable advance notice and hold a permanency hearing where these persons and their counsel shall be afforded an opportunity to be heard. The persons entitled to notice under AS 47.10.030(b) are entitled to notice of a permanency hearing under this subsection and are also entitled to be heard at the hearing. The child shall be afforded the opportunity to be present and to be heard at the permanency hearing. After the permanency hearing, the court shall make the written findings that are required under (l) of this section. The court shall review an order made under (c)(2) of this section at least annu-

ally to determine if continued supervision, as it is being provided, is in the best interest of the child; this review is not considered to be a permanency hearing and is not governed by the provisions of this subsection that relate to permanency hearings.

**21.** We note that AS 47.10.086(b) expressly empowers the superior court to excuse the department from further compliance with its reasonable efforts duty and to order it to pursue termination in appropriate cases:

(b) If the court makes a finding at a hearing conducted under AS 47.10.080(l) that a parent or guardian has not sufficiently remedied the parent's or guardian's conduct or the conditions in the home despite reasonable efforts made by the department in accordance with this section, the court may conclude that continuation of reasonable efforts of the type described in (a) of this section are not in the best interests of the child. The department shall then make reasonable efforts to place the child in a timely manner in accordance with the permanent plan and to complete whatever steps are necessary to finalize the permanent placement of the child.

**22.** Jane's appeal does not challenge the master's decision, as such.