v.

STATE of Alaska, DEPARTMENT OF HEALTH & SOCIAL SERVICES, DIVISION OF FAMILY & YOUTH SERVICES, Appellee.

R.H., Appellant,

v.

State of Alaska, Department of Health & Social Services, Division of Family & Youth Services, Appellee.

Nos. S–9932, S–9938.

Supreme Court of Alaska.

March 8, 2002.

Gayle J. Brown, Law Offices of Gayle Brown, Anchorage, for Appellate S.H.

J. Stefan Otterson, Law Office of Thom F. Janidlo, Anchorage, for Appellant R.H.

Jan Hart De Young, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before: FABE, Chief Justice, EASTAUGH, BRYNER, and CARPENETI, Justices.

*OPINION*

FABE, Chief Justice.

## I. INTRODUCTION

The Department of Health and Social Services, Division of Family and Youth Services (DFYS) petitioned to terminate the parental rights of S.H. and R.H. In April 1999 a DFYS social worker removed S.H.'s five children from the home after receiving a report that S.H. was using cocaine and that R.H. had returned home in violation of a restraining order. The primary issue before the superior court was whether the parents' recent efforts to eliminate substance abuse and domestic violence from the home and to attend to their children's complicated needs were sufficient to remedy their harmful conduct within a reasonable amount of time. After a four-day hearing in September 2000, the trial court terminated the parental rights of S.H. and R.H. Both parents appeal. Because the trial court's findings are not clearly erroneous, we affirm.

## II. FACTS AND PROCEEDINGS

### A. The Children

R.H. and S.H. were married from 1991 to 2000. S.H. is the mother of four boys and one girl: J.F., a son born in 1986; S.F., a son born in 1990; T.H., a son born in 1992; V.H., a daughter born in 1994; and D.H., a son born in 1995. R.H. is the father of the three youngest children. J.F. and S.F. were fathered by two different men.

#### 1. J.F.

J.F., the eldest child, was born in 1986 to S.H. and an Alaska Native who has not been involved in J.F.'s upbringing and is not a party to this appeal. J.F. is eligible for membership in the Orutsararmuit tribe by virtue of his father's membership.

J.F. was hospitalized twice in 1999 at Charter North Hospital (Charter) due to aggression and his attempt to jump out of a window at a shelter. He was subsequently transferred to Alaska Children's Services (ACS) residential treatment where he remained for at least nine months. According to his ACS case manager:

> [J.F.] has a history of defying parents and other adults, severe verbal and physical outbursts, destroys property, attempts to injure children, lies, acts without considering consequences, ADHD [attention deficit hyperactivity disorder] per diagnosis, easily agitated, refuses to comply with normal duties, attempts to manipulate others, associates with negative peers, fire setting, mood swings, depression, anxiety and grief issues.

When hospitalized at Charter, J.F. admitted, "I get mad quickly. I have an anger problem." J.F. was diagnosed as possibly suffering post traumatic stress disorder and major depression. Psychological testing revealed that he may have been sexually abused.

#### 2. S.F.

S.F. was born in December 1990 to S.H. and another man who is not a party to this appeal. S.F. was described as having "a history of defying parents and other adults, hyperactive behavior, impulsive behavior, usually withdrawn and quiet, anxious, needs constant supervision, history of abuse and neglect, shows no attachment, grief and loss issues." He also has "varied symptoms of repressed anxiety." A neuropsychologist

who assessed him concluded that S.F. "needs to reside in a structured, predictable, and highly supportive environment that provides him with the experience of safety and consistent guidance.... [E]xcessive environmental stimuli should be limited ... because he is easily overwhelmed."

### 3. T.H.

T.H. was born in August 1992. From the summer of 1998 to January 1999, T.H. was admitted to Charter three times for two to three weeks each time. Upon the initial intake, he was described as follows:

> This five-year-old, who has been treated by Dr. Lynn Clark for attention deficit on Ritalin and imipramine, has manifested severe behavior to the point of bizareness [sic]. He is not containable by his parents with extreme aggression, fighting, kicking and severe destruction of property. His behavior is unremitting and also violent to other children with having to be under observation continuously.

The admitting doctor stated that T.H. "looks as if he could be in a black and white picture as a refuge[e] child behind barbed wire in a wartime photo. Thusly trauma is written on his face." After his third hospitalization, T.H. was transferred from Charter to ACS residential treatment where he lived from February 1999 to February 2000.

A neuropsychological evaluation to assess T.H.'s "aberrant behavior and emotional dysfunction" in May 2000 revealed that his hyperactive and aggressive behavior has not ceased. He was again admitted to Charter after reporting that he had experienced auditory hallucinations telling him to harm himself. T.H. was diagnosed with post traumatic stress disorder and was found to be "clearly struggling with psychosis."

### 4. V.H.

V.H., the only daughter of S.H. and R.H., was born in May 1994. In June 1997 DFYS received a report of suspected sexual abuse of V.H. The report alleged that S.H. had invited a couple she had met on a dating chat line to her house to engage in sexual activities. S.H. had previously learned that the couple had lost custody of their children to the state. The man reportedly assaulted T.H. and molested V.H., then three years old, while in the home. The incident was reported to the Anchorage Police Department.

One of V.H.'s teachers reported in May 2000 that V.H. "had come to school disheveled and unkempt, that she exhibited difficulties with her school work, and that she displayed inappropriate behaviors with the male children in her class." A neuropsychologist recommended that V.H. "reside in a very structured, predictable, and nurturing environment where appropriate displays of affection are emphasized and personal boundaries are gently clarified."

### 5. D.H.

D.H., the youngest child, was born in December 1995. He was hospitalized during January 1996 for lung problems and was diagnosed with "reactive airway disease." Despite recommendations to refrain from smoking around D.H., DFYS social workers who visited the home noted that S.H. and R.H. continued to smoke in the home. A licensed therapist who assessed D.H. in January 2000 testified that D.H. had been harming his foster parents' pets, had reenacted domestic violence in his play, and had described violence in his home.

### B. DFYS Involvement

Ten reports of suspected child abuse were made to DFYS starting in 1987. On June 5, 1997, the first substantiated report to DFYS was made based on an incident in which R.H. assaulted J.F., T.H., and S.H. while he was intoxicated. According to DFYS's petition, "[o]fficers reportedly had to draw their weapons on [R.H.] to get him to remove a meat cleaver." Less than three weeks later, DFYS received the report regarding suspected sexual abuse of V.H. and assault of T.H. by a man S.H. met on a dating chat line. It was also reported that S.H. had been verbally and physically abusive to the children.

After this incident, S.H. complied with DFYS instructions to refrain from associating with the man from the chat line and his wife, and S.H. called Southcentral Founda-

tion to become involved in a parent support group and to start V.H. in therapy. However, within several weeks S.H. began missing appointments. In the summer of 1997 DFYS referred the family to the Anchorage Center for Families for counseling.

During T.H.'s hospitalization in June 1998, home-based services were arranged for the family with the Anchorage Center for Families. S.H. and R.H. agreed to participate in mental health assessments, substance abuse evaluations, parenting classes, random urinalysis tests, and three Alcoholics Anonymous/Narcotics Anonymous (AA/NA) meetings per week. S.H. and R.H. were warned that they were at high risk for DFYS involvement if they did not work on their case plan.

In July 1998 DFYS received a report that S.H. and R.H. were participating only marginally in T.H.'s treatment at Charter and that they had threatened to abandon T.H. if he did not behave as they wished. A fourth substance abuse evaluation was scheduled, but in October 1998 the Anchorage Center for Families decided to discontinue services to the family due to chronic noncompliance. Between October 1998 and August 1999, DFYS developed three case plans to address the needs of the children and to assist R.H. and S.H. in meeting those needs.

## C. Procedural History

In the fall of 1998 the trial court found that probable cause existed to believe that the five children were in need of aid. The court ordered temporary supervisory custody to DFYS, while permitting the children to remain in the home. In January 1999 DFYS filed a second petition for temporary custody alleging that S.H. and R.H. were not complying with the DFYS case plan to eliminate domestic violence and substance abuse from the home. After a hearing in early February 1999, Superior Court Judge John Reese awarded supervisory custody to DFYS but allowed the children to stay with S.H., on the condition that R.H. stay away from the home.

In April 1999 DFYS received a report that R.H. had returned to the home in violation of the court's order and that both parents were using crack cocaine. The DFYS social worker who went to the home also reported that it was "extremely filthy" and that S.H. was smoking cigarettes, "despite being told previously by the court that smoking was prohibited due to [D.H.] and [T.H.'s] asthma." DFYS removed the five children from the home, placing J.F. and T.H. in Alaska Children's Services residential treatment and situating V.H., D.H., and S.F. in foster care.

R.H. relinquished his parental rights of T.H., V.H., and D.H. in October 1999. In February 2000 DFYS developed a permanency plan to terminate S.H.'s parental rights, indicating that S.H. "has not addressed any of the issues outlined in previous case plans." DFYS petitioned to terminate parental rights on May 12, 2000. In May or June 2000 R.H.'s request to withdraw the relinquishment of his parental rights was granted. On July 10, 2000, DFYS amended its petition to include the termination of R.H.'s parental rights. In August 2000 DFYS sent a letter to R.H. at Spring Creek Correctional Center, inquiring about R.H.'s participation in the case plan while incarcerated. R.H. failed to respond to the letter.

After a four-day hearing in September 2000, Judge Reese terminated S.H. and R.H.'s parental rights. Both S.H. and R.H. appeal this order, and their appeals have been consolidated.

## III. DISCUSSION

### A. Standard of Review

We apply the clearly erroneous standard when reviewing a trial court's findings on termination of parental rights.[1] Clear error arises only when our review of the entire record leaves us with a definite and firm conviction that the superior court has made a mistake.[2] Whether the superior court's factual findings satisfy applicable

1. *M.W. v. State, Dep't of Health & Soc. Servs.*, 20 P.3d 1141, 1143 (Alaska 2001).

2. *Id.*

child in need of aid statutes and rules is a question of law that we review de novo.[3]

## B. The Trial Court Did Not Err in Concluding that S.H. Failed To Remedy the Conduct or Conditions in the Home that Place the Children at Substantial Risk of Harm.

■ Under AS 47.10.088(a), parental rights may be terminated if the court finds: (1) that the child is in need of aid under AS 47.10.011; (2) that the parent has failed to remedy the conduct or conditions that place the child at a substantial risk of harm or failed to remedy the conduct or conditions within a reasonable time; and (3) that the department made reasonable efforts to provide family support services to prevent out-of-home placement of the child or to return the child to the family home.[4] The court must also "consider the best interests of the child" and any fact relating thereto.[5] The superior court found that this three-part test was satisfied. It further found that DFYS had complied with the Indian Child Welfare Act's placement requirements[6] as they pertained to J.F.

S.H. does not contest the finding that her children are in need of aid. Rather, she maintains that the trial court erred in concluding that she had failed "within a reasonable time" to remedy the conduct or conditions in the home that place the children at substantial risk of harm. S.H. argues that by divorcing her abusive husband and by entering substance abuse treatment, she has taken substantial steps to remedy the primary causes of the emotional damage suffered by the children.

Judge Reese found that the children are in need of aid under five statutory factors: AS 47.10.011(1) (abandonment); AS 47.10.011(6)

(substantial risk of physical harm); AS 47.10.011(8) (mental injury to the child); AS 47.10.011(9) (neglect); and AS 47.10.011(10) (substance abuse of the parent). In his ruling from the bench, Judge Reese noted:

> [S.H.] started her treatment program last week. [R.H. is] going to start his next Monday.... Even if you succeeded in those, it would be months and months before anyone could say with a straight face that there was success happening. And, of course, we all know that the success in these kinds of programs is very elusive. And the kids just don't have time. They need permanency.

We conclude that Judge Reese did not err in finding that S.H. failed to remedy her substance abuse problem within a reasonable time.

Contrary to S.H.'s assertion that her substance abuse problem did not start until April 1999, she tested positive for cannabinoids, cocaine, alcohol, opiates, and amphetamines seven times from April 1994 to October 1995. In 1999 she began using crack cocaine on weekends. S.H. claims that "[s]he was actively seeking treatment by September of 1999." But between April 1999 and March 2000, S.H. tested positive nineteen times for cocaine and cannabinoids. S.H. also failed to follow through on two earlier drug assessment plans and repeatedly failed to complete outpatient treatment.[7]

In February 2000 DFYS developed a case plan for termination of S.H. and R.H.'s parental rights. But even the imminent threat of losing her children was not enough to motivate S.H. to cease her drug use: In March 2000 she tested positive for cocaine and she admitted to having used cocaine as

---

**3.** *Id.; E.M. v. State, Dep't of Health & Soc. Servs.,* 959 P.2d 766, 768 (Alaska 1998).

**4.** *J.H. v. State, Dep't of Health & Soc. Servs.,* 30 P.3d 79, 85–86 (Alaska 2001) (citing AS 47.10.088(a)(1)(B), AS 47.10.088(a)(2), and AS 47.10.086).

**5.** AS 47.10.088(b).

**6.** 25 U.S.C. § 1915(b).

**7.** S.H. attributes to DFYS her failure to remedy her substance abuse problem in the twelve months between when she claims DFYS first identified her problem in August 1999 and the termination hearing in September 2000. S.H. argues that DFYS did not adequately assess her need for in-patient treatment. Judge Reese put it best when he said: "The responsibility of the state to provide reasonable efforts and active efforts does not eliminate the responsibility of the parents to do their part as well. And that's where the failure was here."

recently as May 2000.[8] The June 2000 assessment indicated that S.H.'s resistance to treatment was high and that she was at high risk for relapse. It also noted that S.H. "appears ambivalent concerning need for treatment" and that she "has continued to use illicit substance[s] despite negative consequences."

In making a determination that a parent has failed to remedy the harmful conduct within a reasonable amount of time, the court may consider any fact relating to the best interests of the child, including

> (1) the likelihood of returning the child to the parent within a reasonable time based on the child's age or needs;
>
> (2) the amount of effort by the parent to remedy the conduct or the conditions in the home;
>
> (3) the harm caused to the child;
>
> (4) the likelihood that the harmful conduct will continue; and
>
> (5) the history of conduct by or conditions created by the parent.[9]

S.H.'s substance abuse history, which reflects a pattern of periods of progress followed by periods of heavy substance abuse and neglect of her children's needs, supports Judge Reese's finding that S.H. failed to remedy her substance abuse problem within a reasonable time.[10]

The court properly considered that several more months would pass before S.H. or R.H. could provide a sober, healthy, and stable family environment in which they could focus on their children's complicated special needs. The fact that DFYS already had exhibited such patience with this family made immediate attention to these children's needs all the more crucial. The record also indicates that there is a high risk that S.H.'s substance abuse will continue. The harm caused by S.H. and R.H.'s substance abuse, neglect, and abandonment of their children is evidenced by the fact that the children require therapy as a result of mental and physical injuries received in the home environment. If S.H. had been progressing in outpatient treatment during the year prior to the permanency hearing, her argument that the waiting list for residential treatment made it impossible for her to remedy her conduct within a reasonable time would carry more weight. But she continued to use cocaine during this period, failed to pursue individual counseling, and was noncompliant with outpatient drug treatment.

In addition, we agree with the trial court that S.H. did not remedy her failure to address her children's emotional and therapeutic needs. Judge Reese concluded that "the anger and addiction issues are large and important ... but the main issue here is the parental participation in the children's lives, and especially in their treatment." In finding that the children are in need of aid, Judge Reese recognized the parents' "inability to succeed in following the case plans in any reasonable scope" and their "woefully inadequate" efforts to attend to the children's "complicated" and "special" emotional and therapeutic needs. We conclude that the trial court did not err in ruling that S.H. failed to remedy her conduct within a reasonable period of time.

### C. The Trial Court Did Not Err in Terminating R.H.'s Parental Rights.

#### 1. Termination of the parental rights of R.H. to T.H., V.H., and D.H. was in the best interests of the children.

R.H. maintains that all three children were still subject to being moved to new

---

8. S.H. also claims she attempted to comply with DFYS's drug assessment plan and that her full compliance with DFYS case plans was not required for her to remedy the conduct or conditions that placed her children at risk. However, the trial court correctly concluded that her attempt to comply with the drug assessment plans was insufficient to remedy her conduct within a reasonable time. Furthermore, Judge Reese did not base his decision on S.H.'s lack of "full compliance" with the case plan. Rather, he found that S.H. and R.H.'s "inability to succeed in following the case plans in any reasonable scope" supported the conclusion that these parents had not remedied their harmful conduct.

9. AS 47.10.088(b).

10. See J.H. v. State, Dep't of Health & Soc. Servs., 30 P.3d 79, 86 (Alaska 2001) (holding that despite mother's progress in attempting to conquer her substance abuse problem, she had failed to remedy her conduct within a reasonable time).

placements at the time of trial and that there is no indication that DFYS will ever find an adoptive home for T.H., given the child's severe behavioral problems. R.H. further argues that although there was testimony that the children need a permanent placement, there was no evidence presented regarding the time in which such a placement must be made.

The trial court must consider the best interests of the child in determining whether to terminate parental rights.[11] R.H. cites *A.B. v. State, Department of Health & Social Services*[12] in support of his argument that termination of his parental rights would leave his children orphaned, which would not be in their best interests. Contrary to R.H.'s assertion, *A.B.* stands for the proposition that the risk of a child being "half-orphaned" should be considered in the best interests analysis where DFYS seeks to terminate only one parent's rights and the child will remain in the other parent's custody.[13] Here, DFYS seeks to terminate the rights of both parents, and, therefore, *A.B.* does not apply.

The timeliness of a permanent stable placement for the children is paramount, particularly in this case.[14] The record indicates that the children are in need of a permanent placement with foster parents, adoptive parents, or guardians who can meet the children's special needs and who will be consistent, reliable, and capable of participating in the children's treatment. There is a substantial body of evidence regarding the extensive needs of the children, the parents' history of failing to meet those needs, and the children's repeated exposure to the parents' substance abuse and domestic violence.

Both R.H. and S.H. testified that they have been physically violent towards each other. In July 1995 the court ordered that R.H. was not to have contact with S.H. after he was convicted of assaulting her. In May 1997 R.H. was charged with assaulting S.H., J.F., and T.H. In her petition for a protective order, S.H. reported that R.H. had hit her ten-year-old son and when she tried to intervene, R.H. "hit me and [threw] a toy at my 4 yr son," and then "took kni[v]es from my kitchen and then that's when I call[ed] the cops." He was convicted of disorderly conduct and was sentenced to five years' probation, ordered to have no contact with S.H. or the children, and ordered to complete a domestic violence intervention program.[15] From June 1997 to August 1999, S.H. obtained three domestic violence protective orders against R.H. for his conduct, ranging from verbal threats and harassment to assaults against S.H. and the children.

It is evident from the record that there is a need for the children to be placed immediately in a permanent stable home. The trial court did not err in finding that termination of R.H.'s parental rights was in the children's best interests.

---

11. AS 47.10.088(c).

12. 7 P.3d 946, 954–955 (Alaska 2000) ("In light of DFYS's efforts to unite S.B. and R.H. .... termination of her parental rights has, in effect, left S.B. 'half-orphaned.' If R.H. turns out to be a satisfactory parent for S.B., it is difficult for us to see how severing all ties with A.B. is in S.B.'s best interests.").

13. *See id.* at 955 n. 27 ("The situation would be different if DFYS were attempting to place S.B. into a permanent adoptive home.... Here, however, ... DFYS was seeking to place S.B. with her father, at least until DFYS determines that the father is also not an adequate parent."); *A.H. v. State, Dep't of Health & Soc. Servs.*, 10 P.3d 1156, 1166 (Alaska 2000) (concluding that *A.B.* does not control because "the State petitioned to terminate the parental rights of both [parents], planning to free the children for adoption").

14. *Cf.* AS 47.10.086(b) (providing that once the court finds that the requirements for termination of parental rights have been met, "[t]he department shall then make reasonable efforts to place the child *in a timely manner* in accordance with the permanent plan") (emphasis added); AS 47.05.065(5) ("[N]umerous studies establish that ... (C) it is important to provide for an expedited placement procedure to ensure that all children, especially those under the age of six years, who have been removed from their homes are placed in permanent homes expeditiously.").

15. When asked by his attorney whether he had ever intentionally hurt his children, R.H. responded, "No, I'd never do that. Not with the way I was raised."

## 2. R.H. failed to remedy his conduct in a reasonable time.

██ R.H. argues that there was no testimony that he would not be able to provide for the children's needs within a reasonable time period. He asserts that the only testimony concerning his parenting style was "entirely positive."[16] Although R.H. recognizes that "it would take some additional time" to overcome his substance abuse problem, he maintains that "the evidence does not indicate that time had run out." R.H. testified that he would be out of prison and prepared to assume responsibilities as a parent eighteen months from the time of trial.

We agree with the trial court that R.H.'s efforts were too little, too late. Although R.H. completed parenting classes in prison in August and September 1999, he signed up to begin residential drug treatment that would start only after trial, in October 2000, in a program offered through Wildwood Correctional Facility. And R.H. has presented scant evidence that he has attended to the medical or mental health needs of his children. As recently as December 1998, he was openly defiant towards DFYS's efforts to help him address his own needs and the needs of his children. Given his history of domestic violence and substance abuse from 1995 to 1999, we conclude that the trial court did not err in finding that R.H. had not remedied his harmful conduct within a reasonable amount of time.

## 3. DFYS made reasonable efforts to prevent the break-up of the family.

██ R.H. argues that DFYS made no efforts to prevent the break-up of the family in the four months between his withdrawal of his relinquishment of parental rights in May 2000 and the termination of parental rights hearing. Before terminating parental rights, the trial court must find that DFYS "has complied with the provisions of AS 47.10.086 concerning reasonable efforts."[17] Alaska Statute 47.10.086(a) provides in pertinent part:

> [T]he department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement.

DFYS must "identify" and "actively offer" to the parent "family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid."[18]

We have held that a parent's demonstrated lack of willingness to participate in treatment may be considered in determining whether the State has made reasonable remedial efforts.[19] Despite R.H.'s explicit refusal to work on the November 1998 DFYS case plan, DFYS developed case plans in March 1999 and August 1999 that focused on R.H.'s domestic violence and substance abuse. Again, R.H. stated that he was unwilling to work on the case plan unless he could have custody of his child from a previous relationship. A therapist at Alaska Children's Services testified that in 1999 R.H. told her that he did not want to have contact with T.H. because "[T.H.] did not do anything for him and therefore he did not want to do anything for [T.H.]."

R.H. claims that he relinquished his parental rights because he hoped it would improve S.H.'s chances of keeping custody of the children. But this does not change the fact that he had from November 1998, when DFYS developed the first case plan, to May 2000, when he relinquished his parental rights, to take advantage of the services that DFYS

---

16. The testimony that R.H. cites concerning his "entirely positive" parenting style came from one neighbor whose only contact with R.H. was while talking to him while R.H. was in his yard doing chores or playing with the children. That neighbor never saw R.H. in the home with his children.

17. AS 47.10.088(a)(2).

18. AS 47.10.086(a)(1)-(2).

19. *See N.A. v. State,* 19 P.3d 597, 603–04 (Alaska 2001); *A.M. v. State,* 945 P.2d, 296, 306 (Alaska 1997); *A.H. v. State,* 10 P.3d 1156, 1164 (Alaska 2000); *A.A. v. State, Dep't of Family & Youth Servs.,* 982 P.2d 256, 262–63 (Alaska 1999).

offered him. Instead, he repeatedly rejected DFYS's efforts.

Because R.H. had consistently refused to participate in DFYS case plans, we conclude that DFYS's efforts with R.H. to prevent the break-up of the family were reasonable. After R.H. withdrew his relinquishment of parental rights, DFYS offered him programs and services through the Department of Corrections, including health and parenting classes, residential drug treatment in a therapeutic community, and urinalysis testing. In addition, in August 2000 a DFYS social worker sent a letter to R.H. reminding him of his case plan objectives and inquiring about the programs available in the prison and his participation in the case plan. As we recognized in *A.M. v. State*, "[i]t is of no particular consequence that the Department of Corrections (DOC), rather than DFYS, made these active remedial efforts."[20] The trial court did not commit error by finding that DFYS made reasonable remedial efforts.

## IV. CONCLUSION

The trial court did not err in finding that termination of R.H. and S.H.'s parental rights is in the best interests of the children, that the parents failed to remedy the conduct that put the children at risk of physical and emotional injury within a reasonable amount of time, and that DFYS made reasonable efforts to prevent the break-up of the family. We AFFIRM the trial court's order terminating R.H. and S.H.'s parental rights.

MATTHEWS, Justice, not participating.

**20.** 945 P.2d at 305; *A.A.*, 982 P.2d at 263.