*Notice:* This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@appellate.courts.state.ak.us.

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| EMMA D., | ) | |
| | ) | Supreme Court No. S-15207 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-12-00035 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, | ) | |
| DEPARTMENT OF HEALTH & | ) | No. 6893 – April 11, 2014 |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant. David A. Wilkinson, Assistant Attorney General, Fairbanks, and Michael C. Geraghty, Attorney General, Juneau, for Appellee State of Alaska. Lisa M. Wilson, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

FABE, Chief Justice.

# I.     INTRODUCTION

Emma D.[1] has a history of mental health issues, particularly bipolar disorder, dating back to her early childhood.  The Office of Children's Services (OCS) became involved with Emma and her newborn son, Joey, following reports from Covenant House expressing concern about Emma's homelessness, inability to care for an infant, and feelings of depression and aggression toward Joey.  OCS took the then-six-month-old Joey into emergency custody during Joey's hospitalization for respiratory syncytial virus and dehydration, during which he was also diagnosed with supraventricular tachycardia, a heart disorder that required regular attention and treatment.

OCS staff subsequently made attempts to assist Emma in obtaining regular mental health treatment in order to reunite her with Joey.  OCS staff had difficulty communicating and meeting with Emma; she failed to engage in regular treatment, maintain consistent visitation with Joey, or attend her appointments with case workers and service providers.

The superior court terminated Emma's parental rights 14 months after OCS assumed emergency custody.  The superior court made the required statutory findings, including the findings by clear and convincing evidence that OCS had made reasonable efforts toward family reunification and that Emma had failed to remedy her conduct in a reasonable time.  Emma argues that OCS failed to consider adequately her mental health issues and therefore its efforts were not reasonable.  She also appeals the superior court's finding that she had failed to remedy her conduct in a reasonable time.

After reviewing the record, we conclude that OCS was aware of Emma's mental health issues and made reasonable efforts to engage her but was hampered by her

---

[1]     Pseudonyms are used to protect the privacy of the family.

refusal to communicate and her lack of consistent attendance at meetings, visitations, or treatment appointments. We also conclude that the superior court did not err in finding that Emma had failed to remedy her conduct in a reasonable time. Therefore, we affirm the superior court's decision terminating Emma's parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Emma's Background

Emma is the 21-year-old mother of Joey. Emma suffered sexual, emotional, and physical abuse as a child and was in foster care between ages five and seven. She testified at her parental rights termination hearing that she was first diagnosed with bipolar disorder when she was seven, spent time in hospitals as a child, and between the ages of 13 and 17 was in an out-of-state residential treatment program. She has also been diagnosed with post-traumatic stress disorder "stemming from multiple sexual assaults as a child."

The record indicates that even before Joey's birth and Emma's involvement with OCS, Emma had difficulty finding an effective treatment regime for her bipolar disorder. While she was in the residential treatment program, Emma was treated with therapy and extensive mood-stabilizing and anti-depressant medication for her bipolar disorder. When asked whether the therapy was helpful, Emma testified "[a]s far as emotionally, yes. As far as my behaviors and my actions and my thought process, no." She also detailed her persistent problems finding an effective and sustainable medication regime:

> I was released at 17, but . . . over the years, trying to give me therapy kind of got frustrating because I would get better over six to eight months and then I would . . . slide right back down the hill. . . . I would get to a therapeutic level [of medication] and I'd do good, good, good, but then I'd have a medical issue with the medication as far as Depakote made me stop the production of my white blood cells, Seroquel

made me gain too much weight, Lithium dried me out too much and then I would ask to switch something, but when I would switch it, I would just start going back downhill.

Since returning to Alaska, Emma has not engaged in regular mental health treatment and has been unable to find regular employment or housing, periodically staying at Covenant House or at the Brother Francis Shelter.

## B. Joey's Birth And Subsequent Hospitalization

Emma gave birth to Joey in August 2011.[2] She used Covenant House services throughout her pregnancy. Ten days after Joey's birth, Emma came to the Covenant House shelter in distress. She told staff members that he wouldn't stop crying and hadn't eaten since the previous night; she also described feelings of being "overwhelmed" and suffering from "post-partum psychosis." Emma stated that she had felt like hurting Joey "three different times today" and that "sometimes I think about throwing him against the wall just to get him to shut up." She described feeling like she couldn't take care of him and didn't "even want to touch him." She had been using maxi pads and garbage bags as diapers, and Joey had developed a persistent rash. Covenant House staff filed a report with OCS and called the police.

An OCS specialist attempted to contact Emma and after two days was able to meet with her. Emma denied all the allegations in the Covenant House report but admitted having bipolar disorder for which she was not receiving any treatment or services. The OCS specialist offered Emma mental health services, but Emma declined the services and indicated that she did not want to be medicated. The specialist thought

---

[2]    OCS attempted to identify and make contact with men that Emma listed as Joey's possible father. A paternity test with the man listed on Joey's birth certificate was negative. Another possible father was ruled out by a paternity test. A third possible father was notified by OCS of Emma's termination proceedings; this possible father was incarcerated, opposed to a paternity test, and refused to participate in any proceedings.

that Joey appeared healthy and that Emma "was able to articulate how to care for a child"; OCS took no further action at that time.

In September 2011 OCS received another report from Covenant House indicating concern about Joey's health due to Emma's homelessness, inability to care for an infant, and unrealistic expectations of an infant. After speaking with Joey's primary care physician, the OCS specialist again determined that no further action was necessary at that time. OCS received an additional report in October 2011 indicating that a medical professional had seen Joey and that Joey had smelled of body odor and urine. Another report in January 2012 detailed an incident at the Brother Francis Shelter where Emma appeared at the shelter screaming, temporarily left Joey unattended, and left in an angry and unstable state.

On January 28, 2012, Joey was admitted to Providence Hospital with respiratory syncytial virus and dehydration. The hospital record reports that Emma "has had very poor visitation since the date of admission" and that she provided staff with inoperable phone numbers. On several occasions, Emma was aggressive and abusive toward the hospital staff. Hospital staff also reported "aggressive speech towards the infant as well as aggressive touch." Joey was diagnosed with a heart rhythm disorder called supraventricular tachycardia, meaning that his heart beat could accelerate up to 300 beats per minute. This condition could be life threatening if left untreated or treated improperly. The prescribed treatment was monitoring and medication every eight hours, as well as the application of a cold compress when necessary.

### C.    OCS's Emergency Custody Of Joey In February 2012

Providence Hospital filed a report of suspected harm with OCS. The OCS specialist was eventually able to get Emma to attend a team decision meeting with OCS staff, nursing staff, and the social worker at Providence on February 8, 2012. They discussed Joey's medical condition and Emma's ability to provide care for him as well

as her mental health issues, homelessness, and unpredictable behavior. At the end of the meeting, Emma agreed that Joey should go into a foster home. OCS took emergency custody of Joey, and he was discharged to a foster family able to meet his medical needs.

When Joey was discharged on February 9, 2012, the OCS specialist facilitated a meeting between Emma and the foster parent and asked Emma to participate in developing a case plan. Emma indicated that she was receiving treatment through Anchorage Community Mental Health Services (ACMHS), but she declined to sign a release of information for ACMHS. She did sign a release of information for the Brother Francis Shelter. Emma also declined the specialist's offer to make a referral for mental health assessment, treatment, or medication. The specialist arranged for Emma's visitation with Joey twice a week. OCS filed an emergency petition for adjudication of Joey as a child in need of aid and for temporary custody on February 9, 2012.

### D.    OCS's Case Plan And Efforts To Engage Emma

On February 24, 2012, Emma and Joey's case was assigned to OCS child service specialist William James. Prior to joining OCS, James was a school teacher for 22 years with experience in special education, including work with bipolar youth. James attempted to reach out to Emma with phone calls and offers to meet with her at "her comfort and availability." He found her "reticent to engage with OCS." He scheduled meetings with her on March 1, 9, and 15, but Emma failed to attend the meetings, despite James's calls to remind her and emphasis on his "interest in engaging with her and assisting her in her reunification." They were finally able to meet on March 20, and they developed a case plan.

The case plan noted Emma's "self-proclaimed mental health concerns that prevent her from behaving responsibly, or predictably on a day to day basis. Aggressive moo[d] swings and anger management [problems] create an unsafe environment for her child who has specific medical needs." The case plan listed reunification as the initial

goal and stated OCS's "desire . . . to assist [Emma] in obtaining the help she requires in stabilizing her observed and self-proclaimed depression and mood swings, as well as helping her to learn to care for her son's medical needs." Throughout the case plan, reference was made to Emma's observed and self-reported mental health issues and strategies for addressing them. The case plan detailed OCS's plan to refer Emma to the service providers that she identified as acceptable: ACMHS and CHOICES for mental health services, and Safe Harbor for housing services. The OCS caseworker was to maintain regular contact with the service providers, to provide a bus pass, and to support Emma by scheduling planning meetings with her. The case plan also described Emma's resistance to receiving services, noting that "[Emma] did not believe she needed any support. She stated she just needed to straighten out her housing situation. [Emma] declined assistance with obtaining an assessment at [ACMHS], and she chose not to sign a release of information for ACMHS." She also refused James's help in communicating with Safe Harbor about the possibility of obtaining housing there.

James scheduled additional meetings with Emma, but she failed to attend most of them. James was able to speak with her by telephone on April 5, 2012, and he asked her if she had followed her case plan; she said no. He offered to assist her with the services, including by providing transportation, and she declined his assistance. She also continued to decline to release any information from the mental health service providers to OCS.

Emma received a screening survey from CHOICES on March 19, 2012, which was not sent to OCS at the time because she had not yet signed a release. Under the survey question "Does Client need [fetal alcohol spectrum disorder] assessment?" the staff member wrote "Yes" but for follow-up steps indicated "inappropriate for intervention." On March 30, 2012, CHOICES conducted a behavior health assessment, which recommended case management and psychopharmacology management.

James continued to try to establish regular contact with Emma through March and April with limited success, mostly by telephone but also once by looking for her at the Brother Francis Shelter. Emma attended a court hearing on April 20, 2012, and James was able to speak with her at the court. He asked her to sign the OCS case plan as well as releases of information from her mental health service providers; she again refused. Emma missed the next scheduled meeting but called James on April 25. She was angry because a visit with Joey had been canceled due to his illness, and she accused James of being a liar. James continued to try to meet with Emma through May, but she continued to not attend the scheduled meetings. Emma also missed several appointments at CHOICES. There were also incidents at Brother Francis Shelter that resulted in Emma being barred from the shelter until she attended a grievance meeting; she failed to attend a grievance meeting.

On May 14, 2012, James called Emma to inform her that due to the number of missed visits with Joey, they needed to reevaluate the visitation schedule. OCS visitation supervisors had removed Emma from the visitation schedule, but James had intervened to put her back on the schedule and continued to try to get her to attend the visits. She responded to James's call by again calling him a liar and declaring that she would not be coming to OCS.

Emma's attorney eventually intervened and arranged for a meeting on May 21. Emma did attend this meeting, and she signed releases for ACMHS and CHOICES. James contacted those providers; CHOICES confirmed that Emma had received their services. CHOICES told James that they were helping Emma with managing her calender, seeing other people's perspectives, not speaking violently, maintaining contact, and seeking housing. ACMHS told James that they had no record of Emma. James sent referrals for her to both agencies.

**E.     Child In Need Of Aid Adjudication**

In July 2012 the superior court held an adjudication hearing to determine if Joey was a child in need of aid.  Emma failed to attend the hearing.  She also failed to attend her scheduled visits with Joey; out of the 29 visits that were scheduled as of July 11, three were canceled due to weather; one due to illness; and 17 were missed by Emma.  At the hearing, James reported that at the end of June and beginning of July he had seen some progress with Emma in her willingness to work with him and in her visits with Joey.  He indicated, however, that he wanted to see her maintain that level of positive engagement for several more months before considering a return of custody.  At the hearing, Emma's lawyer commented briefly on OCS's efforts, including the lack of a parenting class, and argued that OCS's case plan "needs to be sort of blunt and concrete so that my client clearly understands what needs to be done and what happens if it doesn't need to be done."  The court acknowledged that Emma's "mental health issues are the crux of the matter" but found that OCS had made reasonable efforts toward family reunification "because everybody here has offered and she has rejected.  We can't make her do things, but they have to be offered to her."  The superior court adjudicated Joey to be a child in need of aid, particularly due to Joey's medical need for careful and consistent attention.

**F.     OCS's Efforts Between The Adjudication Hearing And The Termination Of Parental Rights**

In August 2012 Emma underwent a behavioral health assessment at ACMHS, and James received the results.  The assessment indicated that she had a serious and persistent mental illness but that she was able to express her feelings and make decisions.  ACMHS's case management plan included a psychiatric evaluation, individual therapy, medication management, communication with OCS, and help with establishing safe housing.  James attempted to maintain monthly contact with both

ACMHS and CHOICES. However, sometimes his messages with ACMHS went unreturned. He also attempted to maintain "near weekly" contact with Emma although she responded only once a month on average. When James had an opportunity to speak with Emma, he would ask her if "she was getting the services she felt she needed, if ACMHS was following through on . . . their promises to her and if she needed other services and she typically would respond that she was following her case plan." In September and October 2012, James spoke with Emma's case manager at ACMHS who reported difficulty in contacting or meeting with Emma. When James contacted CHOICES in November 2012, he was informed that Emma had not been in contact with CHOICES since early June and that she had been discharged due to a lack of participation. James attempted to communicate with Emma about her case plan and her need to engage in services through multiple phone calls and letters mailed to Covenant House and to her mother's address.

In November 2012 James was able to meet with Emma, and she responded to his concerns by saying that she was following her case plan and actively engaged with ACMHS. She also told him that she did not need to participate in a case plan, would not work with CHOICES, had no contact with her attorney, and did not want to visit her son or respond to her case worker because she was afraid of being arrested. Because Emma reported greater engagement with ACMHS than the ACMHS case worker reported, James attempted to communicate with ACMHS while Emma was in his office, but they were unable to speak with her ACMHS case worker. When James was able to contact ACMHS in December, the case worker informed him that Emma had missed her recent appointments, including an appointment with a psychiatrist, and had not followed their plan since August. In January 2013 James was informed that Emma was making "sporadic contact" with ACMHS though she appeared to be "disengaged and had been missing recent appointments."

On January 28, 2013, James filed a petition for the termination of Emma's parental rights. The petition detailed Emma's failure to engage with mental health services, work her case plan, establish safe housing, and consistently attend her scheduled visits with Joey. On February 4, 2013, James met with Emma and her attorney. Prior to this meeting, Emma had told James that she was taking the medication prescribed to her by ACMHS. At this meeting, Emma denied taking medication and said that she had not taken medication for several years. Emma told James that she had been assigned a new psychiatrist at ACMHS who refused to prescribe her medication; when James contacted ACMHS, he was informed that she had missed her appointment with her psychiatrist.

In March 2013 the ACMHS case worker told James that Emma had moved into Safe Harbor, which provides housing for "individuals with mental health assessments and recommendations." The case worker told James that the case worker had taken Emma shopping for food and clothes but that Emma remained inconsistent in her interactions and was in danger of losing her housing at Safe Harbor due to her lack of attendance at meetings. The case worker told James that when she was able to meet with Emma, the case worker found that Emma was "belligerent and demanding" and not making progress.

G.    **Termination Of Emma's Parental Rights**

The trial on OCS's petition to terminate Emma's parental rights was held on April 29, 2013. Between the time of Joey's removal in February 2012 until the termination trial in April 2013, Emma was scheduled for 64 visits with Joey; she attended 17. She had 33 scheduled meetings with James; she attended 13. In response to Emma's expressed sleep problems, James asked her to choose a time and location comfortable for her for scheduling meetings and visits. When he scheduled afternoon visits with Joey, she failed to attend. Emma agreed with James's testimony that she had

missed two-thirds of her scheduled visits with Joey. She testified that she missed visits because of family issues and "legal issues with an assault charge and a [domestic violence] order against me."

The superior court found that Joey continued to be a child in need of aid due to Emma's neglect and mental illness and that termination of the parental rights of Emma and any possible father was in Joey's best interests. The superior court also found that OCS's reunification efforts were reasonable, noting James's difficulty in communicating with Emma as well as her misleading statements to James. The superior court terminated Emma's parental rights. She now appeals the superior court's finding that OCS's reunification efforts were reasonable and that she failed to remedy her conduct in a reasonable time.

## III.   STANDARD OF REVIEW

In child in need of aid cases, "we review the trial court's factual findings for clear error and its legal determinations de novo."[3] "Factual findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with a definite and firm conviction that the trial court's decision was mistaken."[4] "Conflicting evidence is generally not sufficient to overturn a trial court's factual findings, and we will not reweigh evidence when the record provides clear support for a trial court's ruling."[5]

---

[3]    *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850, 855 (Alaska 2013) (citing *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[4]    *Id.* at 855-56 (citation omitted).

[5]    *Id.* at 856 (citation omitted).

Whether the parent failed to remedy the conduct or the conditions that placed the child at substantial risk of harm is a factual finding that we review for clear error.[6] "Whether OCS made reasonable efforts to reunify the family is a mixed question of law and fact," and "[w]e review questions of law de novo."[7]

## IV. DISCUSSION

To terminate parental rights under AS 47.10.088, the superior court must make three findings by clear and convincing evidence.[8] "First, the court must find that the child has been subjected to conduct or conditions that have caused the child to be in need of aid."[9] "Second, there must be a finding that the parent has failed, within a reasonable time, to remedy the conduct or conditions that placed the child at substantial risk of harm."[10] "Third, the court must find that OCS made reasonable efforts to promote reunification."[11] "The court must also find by a preponderance of the evidence that termination is in the child's best interests."[12] Emma does not challenge the superior court's findings under AS 47.10.011 that Joey was a child in need of aid. She challenges only the superior court's findings that OCS made reasonable efforts and that Emma failed to remedy her conduct in a reasonable time.

---

[6] *Sherman B.*, 290 P.3d at 428 (citation omitted).

[7] *Id.* (citations omitted).

[8] *Id.*

[9] *Id.* (citing AS 47.10.088(a)(1); AS 47.10.011).

[10] *Id.* (citing AS 47.10.088(a)(2)(A)-(B)).

[11] *Id.* (citing AS 47.10.088(a)(3); AS 47.10.086 (describing department's duty to make reasonable efforts)).

[12] *Id.* (citing CINA Rule 18(c)(3) (comporting with AS 47.10.088(c))).

**A.** **The Superior Court Did Not Err In Finding That OCS Made Reasonable Efforts To Reunify Emma With Joey.**

Alaska Statute 47.10.088 requires the superior court to find by clear and convincing evidence that the State has made timely and reasonable efforts to provide services to the family for the purpose of reunification before terminating parental rights. Alaska Statute 47.10.086(a) elaborates on the reasonable efforts requirement by requiring the State to

> (1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid;
>
> (2) actively offer the parent or guardian, and refer the parent or guardian to, the services identified under (1) of this subsection; the department shall refer the parent or guardian to community-based family support services whenever community-based services are available and desired by the parent or guardian; and
>
> (3) document the department's actions . . . .

In considering the reasonableness of the State's efforts, "[w]e have acknowledged that the State has some discretion both in determining what efforts to pursue and when to pursue them."[13] "A parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide. The efforts that OCS makes must be reasonable but need not be perfect."[14]

Emma's primary argument on appeal is that OCS's efforts were not reasonable because they failed to adequately take into account her disability, which her brief identifies as her diagnosed bipolar disorder and the potential of undiagnosed fetal alcohol spectrum disorder (FASD). She relies heavily on our decision in *Lucy J. v. State,*

---

[13] *Id.* at 432 (citations omitted).

[14] *Id.* (internal quotation marks omitted) (citations omitted).

*Department of Health & Social Services, Office of Children's Services*[15] for her argument that her disability mandated additional or different efforts from OCS. She also makes passing reference to the Americans with Disabilities Act (ADA).[16]

In *Lucy J.*, we addressed a mother's arguments that OCS failed to reasonably accommodate her disability under the ADA because her case plan did not incorporate her disability diagnosis and because OCS had difficulty communicating with her disability services provider.[17] In response to the mother's arguments, we noted that "[o]ur case law and the internal policies of OCS suggest that family reunification services should be provided in a manner that takes a parent's disability into account."[18] We concluded that "the 'requirement that [OCS] make reasonable efforts to provide [a parent] with family support services appears to be essentially identical to the ADA's reasonable accommodation requirement.' "[19] We determined that an independent analysis under the ADA was unnecessary because "the question whether reunification services reasonably accommodated a parent's disability is already included within the question whether active or reasonable efforts were made to reunite the family. . . . OCS must reasonably tailor those [reunification plan] steps to the client's individual capabilities."[20] We also noted that in determining whether OCS met its burden, "a court

---

[15]    244 P.3d 1099 (Alaska 2010).

[16]    42 U.S.C. §§ 12101-12213 (2012).

[17]    244 P.3d at 1115.

[18]    *Id.*

[19]    *Id.* at 1116 (alterations in the original) (quoting *J.H. v. State, Dep't of Health & Soc. Servs.*, 30 P.3d 79, 86 n.11 (Alaska 2001)).

[20]    *Id.* (footnote omitted).

may consider 'a parent's demonstrated lack of willingness to participate in treatment.' "[21]

The mother argued in *Lucy J.* that OCS should have referred her to a different treatment program and that "with proper supports, explanation, and lead time [she] would have been better able to process the plan."[22] We concluded that OCS had made "remarkable and exemplary efforts" at reunification based on a record that showed that OCS made disability services referrals, assisted with housing, and made numerous phone calls and other attempts to remind the mother of meetings and appointments.[23] In upholding the superior court's termination of parental rights, we concluded that "Lucy's repeated failures to complete the elements of her case plan, engage in meaningful . . . treatment, and show up for meetings that OCS had arranged for her provided the trial court with evidence that she was more hindered by her unwillingness to participate in the plan than she was by a lack of capacity to do so."[24] Based on OCS's repeated referrals to treatment programs and the mother's refusal to participate in treatment or engage with OCS, we concluded that "[a]ny argument that OCS failed to refer Lucy to a particular plan or to offer her more explanation or lead time is simply not persuasive."[25]

We have held that " 'the requirement that the state offer reunification services is fulfilled by setting out the types of services that a parent should avail himself

---

[21]     *Id*. at 1114 (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

[22]     *Id*. at 1115.

[23]     *Id*. at 1117.

[24]     *Id*.

[25]     *Id*. at 1115.

or herself of in a manner that allows the parent to utilize the services.' "[26] Another recent decision from this court reviewing the termination of parental rights involved the adequacy of OCS's reunification efforts with a parent unwilling to engage with services or follow a case plan.[27] The mother in that case argued that OCS cannot "passively accept a parent's reluctance to participate in a mental health evaluation," but we concluded that "her argument is contradicted by the social worker's testimony that it is not possible to force an unwilling client to participate in mental health treatment."[28] We acknowledged the difficulty of dealing with uncooperative parents and reiterated our conclusion that "requiring OCS to seek court orders for every uncooperative parent would put a huge and pointless burden on the department and the court system."[29] We concluded that OCS had made sufficient efforts to provide mental health services when OCS referred the mother to a mental health assessment and offered to help her reengage with mental health services after she had stopped participating.[30] In upholding the superior court's finding, we noted the mother's refusal of OCS's help in reengaging in

---

[26]    *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 679 (Alaska 2008) (quoting *Frank E. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 77 P.3d 715, 720 (Alaska 2003)).

[27]    *Chloe O. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 309 P.3d 850 (Alaska 2013).

[28]    *Id.* at 857.

[29]    *Id.* (quoting *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 102 (Alaska 2008)).

[30]    *Id.*

services and her discharge from a treatment program due to her "inappropriate behaviors."[31]

The State does not dispute that OCS must take a parent's disability into account in its case plan but argues that the record shows that OCS took Emma's disability into account and its efforts were reasonable. In support of this argument, the State cites to numerous places in the record to show OCS's awareness of Emma's mental health issues and James's testimony that he attempted to "wrap services around her with people she could communicate with [and] interact with." James testified that he "coordinated with those services providers, encouraged [Emma] to engage with them, sought out her input as to how [he] could assist her with that engagement."

The case plan prepared by James included numerous references to Emma's mental health issues and her need for mental health treatment. The case plan also set out a plan for Emma to receive mental health treatment at ACMHS and CHOICES and housing assistance from Safe Harbor with OCS maintaining contact with her and her service providers and providing her with transportation assistance.

Emma does not dispute James's testimony about his numerous attempts to contact her and meet with her and maintain contact with the service providers. Nor does she dispute the fact that she missed the majority of her meetings with James as well as the majority of her visits with Joey. Instead Emma offers extended argument about additional steps that she feels OCS should have taken, including a FASD evaluation and individual counseling. While there is some evidence in the record of initial concern by both OCS and CHOICES over the possibility of FASD, CHOICES's subsequent behavior health assessment did not identify FASD as a concern. Emma did not present

[31]    *Id.*

-18-                                                                                           6893

evidence or claim to the superior court that she in fact suffers from FASD or that she was unable to understand her case plan.

Emma also argues that OCS should have ensured that she received medication and individual counseling; arranged for a more proactive agency than CHOICES; and made her case plan "more concrete." Emma does not explain how OCS could have ensured treatment given the fact that she failed to consistently respond to attempts at communication or attend scheduled meetings and appointments with OCS or with her service providers.

Contrary to Emma's arguments, we conclude that not only were OCS's efforts reasonable, but that James made commendable efforts to reunify Emma with Joey. He consistently made efforts to communicate with Emma, despite her unresponsiveness, even going so far as to personally seek her out at Brother Francis Shelter. He also intervened to keep Emma on the visitation schedule after she missed the majority of her scheduled visits with Joey, and he attempted to maintain contact with Emma's mental health service providers despite receiving contradictory and misleading information from Emma.

Based on Emma's unwillingness to engage in treatment or services, we conclude that the superior court did not err in its finding of reasonable efforts.

**B.      The Superior Court Did Not Err In Finding That Emma Failed To Resolve Her Conduct In A Reasonable Time.**

To terminate parental rights, the superior court must find by clear and convincing evidence that the parent has "failed, within a reasonable time, to remedy the conduct or conditions . . . that place the child in substantial risk so that returning the child to the parent would place the child at substantial risk of physical or mental injury."[32]  A

_____

[32]      AS 47.10.088(a)(2).

reasonable time is statutorily defined as "a period of time that serves the best interests of the child, taking in[to] account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments."[33] In determining whether a parent has remedied his or her conduct in a reasonable time, the superior court "may consider any fact relating to the best interests of the child."[34] "[W]hether the parent failed to remedy the 'conduct or the conditions that placed the child at substantial risk' of harm [is a] factual finding[] reviewed for clear error."[35]

The superior court found by clear and convincing evidence that Emma had failed to remedy the conduct and conditions that placed Joey at substantial risk of harm and that "it's clear that the best interest of [Joey] would be to terminate."

Joey was placed into foster custody in February 2012, and OCS filed a petition for termination of parental rights in January 2013. Emma points to AS 47.10.088(d), which requires OCS to file a termination petition if the child has been out of the parent's custody for 15 of the most recent 22 months, and argues that OCS pursued termination "much faster than the law mandates." In *Christina J. v. State, Department of Health & Social Services, Office of Children's Services*,[36] we upheld termination when the petition was filed nine months after OCS took custody. In rejecting an argument similar to Emma's, we explained our reasoning:

> AS 47.10.088(g) explicitly allows OCS to file a petition for termination *before* the expiration of the mandatory foster care period (i.e., 15 out of 22 months) if it "determines that filing

---

[33]    AS 47.10.990(28).

[34]    AS 47.10.088(b).

[35]    *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012) (citation omitted).

[36]    254 P.3d 1095 (Alaska 2011).

a petition is in the best interests of the child." This provision suggests that the 22-month period is not intended as a minimum time OCS must wait before filing. Rather, OCS determines when to file a petition based exclusively on the best interests of the child; the statute defines "reasonable time" not as a specific number of months or by reference to parents' needs, but as "a period of time that serves the best interests of the child, taking in[to] account the affected child's age, emotional and developmental needs, and ability to form and maintain lasting attachments." As the superior court noted, this period is likely to be shorter for young children; the legislature has recognized, and expert witnesses confirmed in this case, that children "undergo a critical attachment process before . . . they reach six years of age," and a failure to bond with adult caregivers during this time can result in lasting emotional damage.[37]

We cautioned that the determination "must be made on a case-by-case basis and the amount of time considered 'reasonable' will vary," but we "emphasize[d] that the statute clearly puts the criteria for 'reasonable time' in terms of the child's needs."[38] We upheld the superior court's finding based on the child's age and the parent's lack of progress.[39]

The guardian ad litem submitted a brief in this appeal to emphasize that the superior court considered evidence that "[w]hile [Joey] thrived in foster care, [Emma] failed to complete her case plan and failed to comply with service providers." In addition to the evidence discussed above regarding Emma's failure to attend visitations with Joey and lack of cooperation with OCS and mental health service providers, the superior court heard testimony about Emma's long history of mental health issues and her life-long difficulties in establishing an effective and sustainable treatment regime. The superior

---

[37]    *Id.* at 1106-07 (internal footnotes and citations omitted).

[38]    *Id.* at 1108.

[39]    *Id.*

court also heard testimony about Joey's health improvement while in foster care and his bonding with his foster family. Based on the record, we conclude that the superior court did not err in finding that Emma failed to remedy her conduct in a reasonable time as defined by statute and in light of Joey's best interests.

## V.    CONCLUSION

For the foregoing reasons, we AFFIRM the superior court's termination of Emma's parental rights.