NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite a memorandum decision in a brief or at oral argument should review Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| PHOEBE S., | ) | |
| | ) | Supreme Court No. S-15112 |
| Appellant, | ) | |
| | ) | Superior Court Nos. |
| v. | ) | 3AN-11-00042/00043 CN |
| | ) | |
| STATE OF ALASKA, | ) | MEMORANDUM OPINION |
| DEPARTMENT OF HEALTH & | ) | AND JUDGMENT* |
| SOCIAL SERVICES, OFFICE OF | ) | |
| CHILDREN'S SERVICES, | ) | No. 1495 – April 23, 2014 |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Erin B. Marston, Judge.

Appearances: Dianne Olsen, Law Office of Dianne Olsen, Anchorage, for Appellant. John M. Ptacin, Assistant Attorney General, Anchorage, and Michael C. Geraghty, Attorney General, Juneau, for Appellee. Anita Alves, Assistant Public Advocate, and Richard Allen, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Fabe, Chief Justice, Winfree, Stowers, Maassen, and Bolger, Justices.

---

\*      Entered under Appellate Rule 214.

## I.   INTRODUCTION

Phoebe S. appeals the termination of her parental rights to her minor children, Joy and Frances.[1]  She challenges the superior court's rulings that:  (1) the children were children in need of aid (CINA) under multiple subsections of AS 47.10.011; (2) she failed to remedy the conduct that placed the children in need of aid; (3) the State of Alaska, Department of Health and Social Services, Office of Children's Services (OCS) made reasonable efforts to reunify the family; and (4) termination of her parental rights was in the children's best interests.  Because all of the superior court's findings are supported by the record, and the superior court made no legal error, we affirm the superior court's decision to terminate Phoebe's parental rights.

## II.    FACTS AND PROCEEDINGS

In January 2011 the Anchorage Police Department responded to a call from a foreclosed home where the owner had found Phoebe and her children sleeping on the basement floor.  Phoebe thought that her ex-boyfriend[2] still owned the home, despite the fact that when she arrived there was no heat, "[the] place [was] gutted . . . [there was] no stove, no nothing, all [of her] furniture [was] gone," she "ha[d] nowhere for the girls to sleep," and she "[didn't] think [the] house [was] safe anymore."  The next day Phoebe left the children overnight with a woman she barely knew, and when Phoebe did not return, the woman called the police.  During this period, Phoebe admitted that both girls were "malnourished because [they] were stuck in a house . . . with no food to eat."  Phoebe later blamed the children's malnourishment on the fact that she "went to [the

---

[1]    Pseudonyms are used throughout to protect the privacy of the parties.

[2]    This ex-boyfriend, Richard, is the father of Frances and is currently serving a prison sentence for sexual abuse of a minor; Phoebe also accused Richard of sexually assaulting her, but later stated this was a "misunderstanding."

Abused Women's Aid in Crisis (AWAIC) shelter] and they gave [her] a box full of cans," but she did not have a can opener or microwave.

OCS filed a petition to adjudicate Joy and Frances children in need of aid following these events, and the court placed the children in OCS custody. When the girls entered foster care the foster mother took them for a doctor's check-up; both were underweight, below normal height, and had low iron and blood counts. The doctor told the foster mother the children would improve with proper nutrition. When they first entered foster care, both girls ate three adult-size portions of food during meals, and they hoarded food in their clothing for three months. Joy additionally received specialized speech education.

Phoebe left Joy with inappropriate care givers in a prior 2009 CINA case.[3] In the prior case, OCS prepared a case plan that required Phoebe to: (1) complete a mental health assessment; (2) finish a parenting class; (3) maintain regular contact with Joy; and (4) maintain regular housing. In an initial mental health assessment Dr. Richard Cherry noted that Phoebe might suffer from fetal alcohol spectrum disorder (FASD). Dr. Cherry also commented that Phoebe had a "general pattern of symptom

---

[3] On August 9, 2008, Phoebe left Joy with a group of adults. One of the adults kicked and choked Joy, leaving a bruise on the child's hip. Phoebe waited a day to bring Joy to the hospital for medical treatment. After this incident, and based on concerns voiced by OCS, Phoebe sent Joy to live with Phoebe's sister in New Mexico. But information emerged that Phoebe's sister's boyfriend was a registered sex offender and had access to the home. New Mexico child protective services also received information about people using drugs in the home.

When an Alaska OCS social worker later discussed the situation with Phoebe, Phoebe stated that she knew the boyfriend had been charged with sexual abuse of a minor, but her sister told her the charges had been dropped. OCS flew a family friend of Richard's to pick Joy up in Arizona and the agency assumed custody of the child shortly thereafter.

denial/minimization" and that she exhibited "extremely poor insight regarding the nature of her referral." Dr. Cherry concluded that Phoebe

> evidenced a well-entrenched victim-stance, in which she blamed all of her issues on OCS and negligent workers . . . . [Phoebe's] failure to accept responsibility for her issues suggests that she [has a] very high likelihood of continuing the same pattern of problematic parenting behavior . . . . Overall, [Phoebe's] prognosis is fair/poor.

Despite this assessment, OCS returned Joy to Phoebe at a women's shelter, and in July 2010 the superior court closed Joy's case because OCS concluded Joy and Frances were not at risk of harm at the shelter.

In the present case OCS prepared a case plan for Phoebe that required her to complete an FASD assessment. OCS planned to use the information from the assessment to tailor a reunification plan. In May 2011 Dr. Cherry again evaluated Phoebe and this time conclusively diagnosed her with a cognitive disorder associated with FASD. Dr. Cherry testified at trial that he believed Phoebe would need "intensive living support to . . . live independently" because of "impaired judgment, . . . impulsivity, . . . [and] problems with decision-making." Dr. Cherry stated that Phoebe required independent therapy because "across two different evaluations, [Phoebe] accepted basically no responsibility for her circumstances and had a very consistent pattern of blaming [OCS] and various other entities for her issues." In Dr. Cherry's professional opinion, "the most important thing for [Phoebe] to evidence improvement would be [to attend therapy] to take responsibility for her issues[,] and the fact that she [isn't doing that] and [is] denying problems and instead blaming other people . . . doesn't give [assisting professionals] a whole lot to work with."

As a result of Dr. Cherry's assessment, OCS referred Phoebe to The Arc of Anchorage (ARC). ARC would have provided Phoebe with mental health counseling,

assisted living, job training, and assistance finding housing. OCS also referred Phoebe to the Stone Soup Group, which provided "parent navigators" to assist with hands-on parenting for people with developmental or cognitive delays. Phoebe did not qualify for ARC's state disability waiver program through Medicaid, in part because Phoebe submitted paperwork where she indicated she was able to manage her finances, get employment, and live independently. Phoebe instead focused on going to Job Corps, a residential vocational skills program, because she believed she did not need the additional services; she only needed a job and housing. When OCS learned that Phoebe did not qualify for ARC's "wraparound" counseling services specific to her FASD, the agency referred Phoebe to the Anchorage Community Mental Health Clinic (ACMH). According to the OCS worker, Phoebe did not want the services because she stated she did not need them; ACMH could not even complete the intake or get Phoebe's paperwork. OCS also attempted to refer Phoebe to Good Samaritan and Bridges Counseling, although the OCS worker admitted that those services were not FASD-specific, and Phoebe was ultimately denied from both programs because of her cognitive delays. The OCS worker stated that the primary focus was to get Phoebe counseling, but OCS could not "get past that" stage with Phoebe. OCS did not update Phoebe's case plan following her May 2011 diagnosis.

In the fall of 2011 Phoebe enrolled in Job Corps in Palmer. After graduating from Job Corps in February 2012, Phoebe moved to Anchorage while Joy and Frances remained in foster care in Wasilla. When Phoebe moved to Anchorage she began a relationship with Ralph, another sex offender. Phoebe believed Ralph's account of his sex offense; she also told others that she did not have a romantic relationship with him and he was more like a father figure. She later told the children's foster mother that she planned on marrying Ralph. According to Ralph's parole officer, Ralph was not safe around Phoebe's children and being with Phoebe jeopardized Ralph's parole status.

OCS made it clear to Phoebe that her relationship with Ralph was hindering her ability to reunify with Joy and Frances.

After Phoebe moved to Anchorage, OCS provided Phoebe with a Valley Mover bus pass so that visitation with Joy and Frances could continue. But visits became more infrequent as time went on and were ultimately terminated in July 2012 after Phoebe canceled six visits; she had not seen the children since May 2012. In October 2012 the foster parents moved to Soldotna for work and took Joy and Frances with them.

OCS filed a petition to terminate Phoebe's parental rights in May 2012 because of Phoebe's lack of engagement in services. OCS records showed that Phoebe waited until September 2012 to contact OCS to set up alternative visitation with the children following the termination of the prior visits. During that time Phoebe was, in her own words, "bouncing back and forth" between Brother Francis Shelter and the Merrill Field Inn. Phoebe also continued associating with Ralph. OCS attempted to set up quarterly visits for Phoebe to visit the children in Soldotna. One visit occurred in November 2012.

The OCS social worker assigned to Phoebe's case continued to encourage Phoebe to engage in counseling; she suggested private therapists for Phoebe and followed up with ACMH. ACMH told the worker that Phoebe went in for an intake interview and stated that she didn't want the services and that OCS was "making her come" and "she didn't feel like she had any issues to work on." The worker also followed up with ARC, and an ARC employee told the worker that Phoebe "was saying that she felt like she's independent and that she [didn't] need [the] kind of services that . . . ARC could provide for her." Even after Phoebe stopped returning phone calls from OCS in November 2012, the social worker assigned to the case drove to the Econo Inn in Anchorage in an attempt to contact Phoebe.

The superior court held a three-day termination trial in February 2013. At the time of trial, Phoebe still did not have stable housing. When asked how she would get stable housing if the children were returned to her, Phoebe responded "I will work on it." The superior court terminated Phoebe's parental rights on March 20, 2013. Phoebe timely filed this appeal.

## III. STANDARD OF REVIEW

"In child in need of aid cases, we review the trial court's factual findings for clear error and its legal determinations de novo."[4] "Factual findings are clearly erroneous if, after reviewing the record in the light most favorable to the prevailing party, we are left with a definite and firm conviction that the trial court's decision was mistaken."[5] "Conflicting evidence is generally not sufficient to overturn a trial court's factual findings, and we will not reweigh evidence when the record provides clear support for a trial court's ruling."[6] "Whether OCS made reasonable efforts to reunify a family is a mixed question of law and fact."[7]

## IV. DISCUSSION

In order to terminate parental rights, the superior court must find by clear and convincing evidence that a child is in need of aid under at least one subsection of

---

[4] *Emma D. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, ___ P.3d ___, Op. No. 6893 at 6, 2014 WL 1408502 (Alaska, Apr. 11, 2014) (internal quotation marks omitted) (citations omitted).

[5] *Id*. (internal quotation marks omitted) (citations omitted).

[6] *Id*. (internal quotation marks omitted) (citations omitted).

[7] *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 428 (Alaska 2012) (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

AS 47.10.011.[8]  Only one statutory basis is required for such a finding.[9]  The superior court found that Joy and Frances were children in need of aid under four subsections of AS 47.10.011; we will specifically discuss Phoebe's challenge to subsection (9) (neglect).

Phoebe argues on appeal that the superior court must also consider AS 47.10.019[10] when making its adjudicatory findings; in other words, she argues that the superior court impermissibly found that Phoebe neglected Joy and Frances solely on the basis that she was poor and lacked adequate housing.  The record provides ample evidentiary support for the superior court's finding of neglect, and AS 47.10.019 by its clear wording that "this section may not be construed to prevent a court from finding that

---

[8]  AS 47.10.088(a).

[9]  *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 762 (Alaska 2009); *G.C. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 67 P.3d 648, 651 (Alaska 2003) (affirming superior court's finding that child was in need of aid under AS 47.10.011(1) and declining to review the court's findings under AS 47.10.011(2) or (9) or AS 25.23.180(c)(3), "since one statutory basis is sufficient for finding a child to be in need of aid in a termination proceeding").

[10]  That statutes provides:  "Notwithstanding other provisions of this chapter, the court may not find a minor to be a child in need of aid under this chapter solely on the basis that the child's family is poor, lacks adequate housing, or exhibits a lifestyle that is different from the generally accepted lifestyle standard of the community where the family lives.  However, *this section may not be construed to prevent a court from finding that a child is in need of aid if the child has been subjected to conduct or conditions described in AS 47.10.011-47.10.015.*"  (Emphasis added.)  Neglect is defined in AS 47.10.014.

a child is in need of aid if the child has been subjected to conduct or conditions described in AS 47.10.011-47.10.015," which includes section .014 (neglect).[11]

The superior court did not impermissibly find Joy and Frances to be children in need of aid solely on the basis that Phoebe lacked adequate housing. Moreover, OCS attempted to secure safe housing for Phoebe and successfully placed her in Clare House, Safe Harbor, and the AWAIC shelter. When police arrived at Richard's foreclosed home in January 2011 and found Phoebe and the children staying there, Phoebe could not be placed in a shelter that allowed children because "she had been kicked out of these shelters before and wasn't allowed entry." This evidence demonstrates that service providers offered Phoebe secure housing, and Phoebe's own conduct and poor choices prevented her from accessing these services.

Phoebe admitted that when she inhabited Richard's former home there was no stove, and both girls were "malnourished because [they] were stuck in a house . . . with no food to eat." Phoebe blamed the children's malnourishment on the fact that she "went to [the] AWAIC shelter and they gave [her] a box full of cans," but she did not have a can opener or microwave. Phoebe also told the foster mother that she "gave [her food stamp card] to a friend to go get groceries and [the friend] just never came back." Again, this evidence demonstrates that OCS and other service providers offered Phoebe financial and other reasonable means to feed her children, yet she did not take advantage of these services.

---

[11]     AS 47.10.014 provides: "[T]he court may find neglect of a child if the parent, guardian, or custodian fails to provide the child with adequate food, clothing, shelter, education, medical attention, or other care and control necessary for the child's physical and mental health and development, though financially able to do so *or offered . . . other reasonable means to do so*." (Emphasis added.)

Phoebe argues that she did not neglect Joy and Frances by leaving them with "virtual strangers." But Phoebe left Joy and Frances with a woman she had met at the AWAIC shelter whom she hardly knew. This woman watched the girls overnight, and the next day she called the police because she could no longer watch them and she had not heard from Phoebe. Clare House shelter records also indicated that Phoebe left the children unsupervised or with other residents there, and in the prior CINA case involving Joy, Phoebe also left Joy with inappropriate care givers. These facts are sufficient to support the superior court's finding that Phoebe neglected her children.

Phoebe next asserts that if she has not yet remedied her conduct, it is because OCS did not appropriately tailor its case plan and services to her special needs as a mother suffering from FASD. Phoebe also contends that the findings about the harm to the children were overstated and had to do with actions prior to the time she engaged in services.

The superior court correctly found that Phoebe did not rectify her conduct in a reasonable time. While Phoebe asserts that OCS did not tailor her case plan to the 2011 FASD assessment, Phoebe fails to acknowledge that she left her first mental health assessment with Dr. Cherry on June 9, 2009, before she completed the assessment. Dr. Cherry could not accurately diagnose Phoebe with FASD, despite the fact that he suspected it. Phoebe complained during the assessment that it was "unfair," that she "[did]n't see the point" of OCS involvement, and that she felt the process was unjust. Despite not updating Phoebe's case plan, OCS referred Phoebe to FASD-specific services, and Phoebe refused to cooperate in the process that would have secured her

those services. She cannot complain of the timing of remedying her conduct when her own choices prevented her progress.[12]

Phoebe also did not timely address her lack of suitable housing. In the months before the 2013 trial, Phoebe was "bouncing back and forth" between Brother Francis Shelter and the Merrill Field Inn. At trial Phoebe still did not have a proposed plan for safe and stable housing or other resources required to raise children, stating that if she had her children back she would be in a shelter in a safer part of town or "probably . . . in an apartment somewhere." The superior court did not clearly err in finding that Phoebe did not timely remedy the conduct that made her children in need of aid.

The superior court did not overstate the harm suffered by the children due to Phoebe's conduct over a protracted period. Phoebe repeatedly left the children with questionable individuals, first when Joy was injured on August 9, 2008, after Phoebe left Joy with a group of adults to visit Richard. And in 2011 Phoebe left the children overnight with a woman she barely knew. It is clear that Phoebe did not consider the long-term psychological consequences of shuttling children back and forth to strangers.

In addition, Phoebe continued to place her children in dangerous proximity to sex offenders. Phoebe sent Joy to New Mexico to live with Phoebe's sister in a home where a registered sex offender either resided or had access. She wanted Richard to adopt Joy, despite the fact he allegedly sexually assaulted Phoebe and was convicted of sexually assaulting a minor. Phoebe was also associating with Ralph, another convicted

---

[12] *Ralph H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 255 P.3d 1003, 1008-09 (Alaska 2011) (where parents: (1) were in denial about the role they played in the harm their children had suffered, and (2) still needed additional services, superior court did not clearly err in finding that parents did not timely remedy the conduct that made their children in need of aid).

sex offender, prior to the children entering OCS custody. These actions demonstrate that Phoebe did not comprehend the safety concerns that OCS first alluded to in the 2009 CINA case.[13] The superior court did not overstate the harm to which Phoebe's conduct exposed the children.

Phoebe next argues that (1) OCS failed to offer services tailored toward Phoebe's disability following her 2011 FASD diagnosis, and (2) OCS inappropriately limited Phoebe's ability to visit her children when they moved.

Phoebe testified at the termination trial that she understood counseling was part of her case plan. She also testified that she "knew more" than a counselor knew. OCS referred Phoebe to ARC for individual therapy that was responsive to her FASD diagnosis, but Phoebe submitted paperwork where she indicated that she was able to manage her finances, get employment, and live independently — thus effectively disqualifying herself from receiving services from ARC. Phoebe instead focused on going to Job Corps because she believed she did not need the additional services; she claimed she only needed a job and housing. When OCS learned that Phoebe did not qualify for ARC's "wraparound" counseling services specific to her FASD, OCS referred Phoebe to ACMH. Phoebe did not think she needed the counseling and mental health services ACMH provided, either; ACMH could not even complete the intake or get Phoebe's paperwork. In short, both ARC and ACMH employees told OCS that Phoebe did not want their services. Phoebe's suggestion that she was "misunderstood if anybody

---

[13] *Sherry R. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 74 P.3d 896, 903 (Alaska 2003) (holding the superior court is entitled to rely on a parent's documented history of conduct as a predictor of future behavior, and that continued conduct — such as continuing to expose children to convicted sex offenders — can itself serve as a basis for a superior court finding that the parent did not timely remedy the behavior that put the children in need of aid).

thought she was unwilling to participate in counseling," is contradicted by her actions and statements in the record.

OCS must make reasonable, but not perfect, efforts,[14] and "[a] parent's willingness to participate in services is relevant to the scope of the efforts OCS must provide."[15] As in *Lucy J. v. State, Department of Health & Social Services, Office of Children's Services*,[16] Phoebe's "repeated failures to complete the [main] element[] of her case plan . . . provided the trial court with evidence that she was more hindered by her unwillingness to participate in the plan than she was by a lack of capacity to do so."[17] Phoebe is correct that in *Lucy J.*, OCS provided the mother "with one-on-one mentoring, using phone calls, face-to-face contact, and written documents to remind Lucy of appointments, visitation changes, and tasks that she needed to complete — techniques recommended by her FASD diagnosis."[18] But in that case we noted that "OCS made remarkable and exemplary efforts to prevent the breakup of Lucy's family."[19] Reasonable efforts is the standard required by law, and OCS met this standard in Phoebe's case.

---

[14]     *Audrey H. v. State, Office of Children's Servs.*, 188 P.3d 668, 678 (Alaska 2008).

[15]     *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 432 (Alaska 2012) (quoting *Sean B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 251 P.3d 330, 338 (Alaska 2011)).

[16]     244 P.3d 1099 (Alaska 2010).

[17]     *Id*. at 1117.

[18]     *Id*. at 1116.

[19]     *Id*. at 1117.

As to Phoebe's assertion that OCS inappropriately limited Phoebe's ability to visit her children when they moved, again, the record in this case supports the superior court's finding that OCS made reasonable efforts to provide visitation. When Phoebe was enrolled in Job Corps in Palmer, OCS set up visits there. When Phoebe chose to move back to Anchorage, despite the fact that the children's foster parents lived in Wasilla, OCS provided her with a Valley Mover bus pass. Phoebe then began canceling visits. Visits were ultimately terminated in July 2012 after Phoebe canceled six visits; she had not seen the children since May 2012. After those visits were terminated, OCS records show that Phoebe waited until September 2012 to contact OCS to set alternate visitation with the children. In October 2012 the foster parents moved to Soldotna for work and took Joy and Frances with them. OCS attempted to set quarterly visits for Phoebe to visit the children. One visit occurred in November 2012. Phoebe stopped returning OCS's phone calls starting in November 2012, and the social worker assigned to the case drove to the Econo Inn in Anchorage in an attempt to contact her. OCS's efforts to provide visitation were reasonable; Phoebe failed to take advantage of these efforts, and the superior court committed no error in so finding.

In short, Phoebe's own lack of participation in the services offered by OCS supports the superior court's finding that OCS made reasonable efforts toward reunification.[20] As described above, Phoebe consistently failed to follow the main aspect of her case plan throughout the duration of OCS involvement.

Finally, Phoebe argues that the superior court erred when it found that termination of her parental rights was in the best interests of Joy and Frances. Neither girl has developmental or speech delays, and both are in a nourishing environment, and

---

[20] *See Sherman B.*, 290 P.3d at 432; *Erica A. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 66 P.3d 1, 7 (Alaska 2003).

have bonded to their foster parents.  The superior court did not clearly err in concluding that this evidence, together with the evidence of Phoebe's lack of progress, established that termination was in Joy and Frances's best interests.

## V.    CONCLUSION

For the foregoing reasons we AFFIRM the superior court in all respects.